### WILLIAMS *v.* CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS — UNGUARDED ELEVATOR OPENING — EQUALLY DIVIDED COURT.

   Judgment for municipal corporation, as owner of building which it used in the performance of municipal purposes, holding it not liable for fatal injuries sustained by employee of moving company, which had been engaged to move furniture from building, who fell down unguarded opening between elevator floor and side of shaft, is affirmed by an equally divided court.

2. TORTS—OVERRULING OF DOCTRINE OF GOVERNMENTAL IMMUNITY— COURTS.

   The judicial doctrine of governmental immunity from liability for ordinary torts is overruled by the Supreme Court, prospectively from this date except for the instant case, per SMITH, EDWARDS, KAVANAGH, and SOURIS, JJ., such overruling to be wholly prospective and limited to municipal corporations, per BLACK, J.

Appeal from Wayne; Baum (Victor J.), J. Submitted October 6, 1960. Reargued April 4, 1961. (October Docket No. 31, April Docket No. 5, Calendar No. 48,328.) Decided September 22, 1961.

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 1160; 52 Am Jur, Torts § 100.

Case by Charlotte L. Williams, administratrix of the estate of Arden H. Williams, deceased, against the City of Detroit, a municipal corporation, Joseph Wolff, commissioner, and Mark Roberts, inspector, department of buildings and safety engineering, for damages arising from death resulting from fall down elevator shaft of municipally-owned building. Action dismissed on motion as to City of Detroit. Plaintiff appeals. Affirmed by an equally divided court.

*Carl T. Storm* and *Walter M. Nelson* (*Stanton, Sempliner, Dewey & Knight, Robert B. Knight* and *Clement J. Waldmann*, of counsel), for plaintiff.

*Nathaniel H. Goldstick*, Corporation Counsel, *Alfred Sawaya* and *Andrew F. Valenti*, Assistant Corporation Counsel, for defendant City of Detroit.

*Amici Curiae:*

*Paul L. Adams*, Attorney General, and *Samuel J. Torina*, Solicitor General, for the Attorney General.

*James B. Stanley*, for Helen Laycott, plaintiff, in her case against the City of Battle Creek, pending on appeal.

*Allan G. Hertler*, City Attorney, for City of Royal Oak.

*Roscoe B. Martin*, Village Attorney, for Village of Rochester.

*Ralph B. Guy*, Corporation Counsel, for City of Dearborn.

*Roscoe O. Bonisteel* and *Roscoe O. Bonisteel, Jr.*, for Michigan Education Association.

*Norman L. Zemke*, for Michigan Chapter of National Association of Claimants' Compensation Attorneys.

CARR, J. (*for affirmance*).   This case has resulted
from a fatal accident that occurred in the city of
Detroit on December 11, 1954.   On that date and for
a number of years prior thereto said city was the
owner of a 6-story building located at 429 Wayne
street, known as the Morgan building.   During such
period of time no part of the structure was rented
or leased, it was under the care and supervision of
the city department of public works, and was used
for municipal purposes.

On the day in question the defendant city was
abandoning the use of said building and was remov-
ing furniture therefrom.   Plaintiff's decedent, Arden
H. Williams, was employed by O. H. Frisbie Moving
& Storage Company which, under contract with the
city, was conducting the operation.   Employed in
connection therewith was an elevator which plaintiff
claims was not properly safeguarded and main-
tained.   The decedent was assisting in carrying a
desk into said elevator at the 6th floor level of the
building and was walking backward.   He was pro-
ceeding toward an opening in the elevator which
was not guarded or protected in any way, as it is
claimed.   There was a space between the elevator
floor and the side of the shaft approximately 30
inches in width.   Mr. Williams fell from the elevator
floor down this shaft and was killed.   Suit was
brought on the theory that defendant city and the
individual defendants were guilty of negligence con-
stituting the proximate cause of the death.

Defendants filed answer to the plaintiff's declara-
tion denying the charges of negligence and claiming
contributory negligence on the part of Mr. Williams.
Subsequently a motion to dismiss was filed on behalf
of defendant city asserting that the Morgan build-
ing was used solely for governmental purposes and
that the city at the time of the accident was perform-
ing a governmental function involving the preserva-

tion of the public health, welfare, and safety and was, in consequence, not liable for damages. Following a hearing on the motion, as appears from the opinion of the circuit judge who heard the matter, certain facts were agreed to from which the conclusion followed that defendant city's claim was correct and that it was in fact in its operation of the Morgan building exercising a governmental rather than a proprietary function. The motion to dismiss was therefore granted, and plaintiff has appealed.

Justice EDWARDS has written for reversal of the judgment entered by the trial court. He prefaces the opinion that he has served with the declaration that:

"From this date forward the judicial doctrine of governmental immunity from ordinary torts no longer exists in Michigan."

Obviously it is contemplated that, prospectively, the State and its various municipalities, governmental agencies, and political subdivisions shall be subjected to liability for damages for torts resulting from the exercise of governmental powers and the performance of governmental functions. We are not here concerned with the exercise of so-called proprietary functions by municipalities of the State which have long been considered as falling into a wholly different category than do governmental functions in the proper sense of the term.

The radical departure from existing law in this State contemplated by Justice EDWARDS, and those of like mind with him, obviously involves the exercise of legislative authority. The fact that the change to be made is prospective only is significant in this respect. In other words, it is proposed that the Court shall declare what the law will be in the future rather than what it is in the present and has been in the past. Such a change will affect not only the

State itself but all governmental agencies of the State, all cities, villages, counties, townships, school districts and other governmental agencies. The burden resulting from such change will fall on the people of Michigan in whom all State sovereignty is invested. The query immediately arises whether the people have in the Constitution that they have adopted, and by which they have created departments and agencies of government for the performance of governmental functions in the public interest, delegated to this Court any such authority as it is now suggested the Court should exercise.

It is conceded that the legislature of the State, under the powers vested in it by the people, may modify the doctrine of governmental immunity as it has done in certain respects in the past, and may abolish it. The exercise of such authority is wholly legislative in character. It has not been vested in the judiciary. On the contrary, the people expressly declared in article 4, § 1, of the present State Constitution (1908) that:

"The powers of government are divided into 3 departments: The legislative, executive and judicial."

And section 2 of the same article renders crystal clear the intent of the fundamental law of the State. It declares:

"No person belonging to 1 department shall exercise the powers properly belonging to another, except in the cases expressly provided in this Constitution."

The admission of the obvious fact that a change in the policy of governmental immunity from liability in cases of the nature here involved is within the scope of legislative authority carries with it the further admission that such action is not within the scope of judicial powers.

Justice Edwards declares in his opinion that some members of this Court have in prior cases expressed dissatisfaction with the doctrine of immunity in the performance of sovereign functions of government, and that the legislature has failed to take action. It must be assumed that the legislature did not consider that it would be for the best interests of the State of Michigan to abolish the doctrine or to further modify it in material respects. The expressions of dissatisfaction that have been made from time to time impose no obligation for legislative action.

Attention is called to court decisions in Florida, Illinois, and California, in each instance by a divided court, rejecting the doctrine of governmental immunity. We cannot agree that such decisions, in view of the overwhelming weight of authority to the contrary, indicate any "major trend" toward the general abolition of the doctrine. Considerable emphasis is placed on the California decision, *Muskopf* v. *Corning Hospital District*, 55 Cal2d 211 (11 Cal Rptr 89, 359 P2d 457), which, incidentally, recognized the authority of the legislature of the State with reference to the subject matter. The dissenting opinion filed by 2 justices of the court called attention to the fact that in *Vater* v. *County of Glenn*, 49 Cal2d 815 (323 P2d 85), the California court, 1 member dissenting, held that the abrogation or restriction of the doctrine of governmental immunity was a legislative matter. Such decision was in accord with prior holdings of the California courts. It was further said in the dissenting opinion (pp 222–224):

"Our State constitution, the instrument which rules (or should rule) our decisions, provides (art 3, § 1), 'The powers of the government of the State of California shall be divided into 3 separate departments—the legislative, executive and judicial; and no person charged with the exercise of powers prop-

erly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this constitution expressly directed or permitted.'  *   *   *

"While this court was repeatedly holding that abolishment of governmental immunity was a legislative question, the legislature enacted various statutes which reduced such immunity in certain fields but did not abolish it, and enacted and re-enacted statutes which dealt with the related problem of suability of the government; therefore, it should be concluded that the legislature agreed with this court that the questions should be resolved by statute rather than judicial decision.  See *Richfield Oil Corp.* v. *Public Utilities Commission* (1960), 54 Cal2d 419 (6 Cal Rptr 548, 354 P2d 4).  *   *   *

"One of the grounds upon which the majority seeks to justify their invasion of the legislative province is that statutory and judicial exceptions to the governmental immunity doctrine 'operate so illogically as to cause serious inequality.'  I had thought that the legislature could abolish immunity in some areas and modify it in others, as it has done, without judicial interference with its efforts, so long as the unevenness of the legislation was not so great as to be unconstitutional.

"Furthermore, I am impelled to comment that it is unfortunate that a court's reversal of itself on a point of law which it has recently and repeatedly considered should appear to depend upon a change of personnel.  A change of court personnel is not, in my concept of judicial duty (under our historic form of government) properly to be regarded as *carte blanche* for the judiciary to effectuate either a constitutional amendment or legislative enactment. Such powers, I think, should be exercised only by the people or by representatives directly responsible to them.

"Because I believe that the question of abolishing governmental immunity is for the legislature, I would affirm the judgment."

The decision of the Florida court in *Hargrove* v. *Town of Cocoa Beach*, 96 So2d 130, did not deny the authority of the legislature to act. The decision is reported in 60 ALR2d 1193, followed by an annotation in which it is said (pp 1198–1200):

"However, while the United States and various State governments have, through legislative action, accepted in some measure the principle of governmental tort liability, the rule of municipal immunity, except as limited by the qualifications and distinctions noted *infra*, section 3, continues to be applied by the overwhelming majority of the courts in this country, and although judicial criticism of the rule is not infrequent and it has been said that the tendency is to restrict rather than to extend the principle of immunity the courts have usually concluded that the doctrine is so well intrenched that relief against it must come, if at all, from the legislatures."

The opinion of the majority of the Illinois court in *Molitor* v. *Kaneland Community Unit District No. 302*, 18 Ill2d 11 (163 NE2d 89), cert den 362 US 968 (80 S Ct 955, 4 L ed 2d 900), declared that its abolition of the rule of governmental immunity should be prospective only. In a strong dissenting opinion by 2 members of the court it was pointed out (pp 41, 42) that such holding would result in a recovery by plaintiff Molitor but not by other parties injured in the same accident. The dissent also contains the following significant statement (p 37):

"I denounce the contention of the court that these legislative limitations on the doctrine of governmental immunity are a justification for its abolition by judicial fiat. The legislature, in restricting the scope of such immunity, is acting in its area of special competence. This court, in abolishing it, has unwisely ventured beyond the range of judicial action."

The dissent also called attention (p 42) to the fact that the legislature, apparently following a decision in the case by the court of appeals of Illinois, had enacted certain legislation expressly granting immunity to various governmental agencies of the State. It thus appears that court action and legislative action were squarely in conflict.

This Court has repeatedly held that in the absence of statute imposing liability a municipal corporation is not liable for the negligence of its agents, representatives, or employees engaged in the performance of a governmental function. In the early case of *Stout* v. *Keyes,* 2 Doug (Mich) 184 (43 Am Dec 465), it was declared that the common law not repugnant to the State Constitution or the laws of the State remained in force and effect until changed or abrogated by legislative action. The principle was further recognized in *City of Detroit* v. *Blackeby,* 21 Mich 84 (4 Am Rep 450). It was there held that the city of Detroit was not liable to respond in damages caused by an alleged defect in a public highway, there being at the time no statute of the State providing for such liability. It was further held that the same rule should be followed as was applicable to towns and counties, the Court saying (p 112) in this respect:

"It is admitted everywhere, except in a single case in Maryland, that there is no common-law liability against ordinary municipal corporations such as towns and counties, and that they cannot be sued except by statute."

See, also, *Commissioner of Highways* v. *Martin,* 4 Mich 557 (69 Am Dec 333).

It has been said by some writers on the subject that the doctrine of municipal immunity under circumstances of the character involved in the case at bar rests on *Russel* v. *Men of Devon,* 2 Durnford &

East TR 667 (100 Eng Rep 359). However, as pointed out by the supreme court of Wyoming in *Maffei* v. *Incorporated Town of Kemmerer,* 80 Wyo 33 (338 P2d 808, 340 P2d 759), the decision in *Russel* v. *Men of Devon, supra,* was supported by prior authority in England. In any event, the doctrine of immunity as applied to municipal corporations sought to be held liable for negligence of their agents, representatives, or employees, came to us as a part of the common law. *City of Detroit* v. *Blackeby, supra.* In this connection it may be noted that the Constitution of 1835[*] continued in effect all laws previously in force in the territory of Michigan until such laws expired by their own limitation or were altered or repealed by the legislature. The Constitution of 1850 was even more explicit, specifying in section 1 of the schedule thereof that:

"The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations or are altered or repealed by the legislature."

In the present (1908) State Constitution the above quoted section from the Constitution of 1850 was repeated with the exception of the last 3 words thereof. Justice EDWARDS regards such deletion as a "significant omission," implying that its purpose was to open the door to the abolition of the doctrine of governmental immunity by judicial fiat. In determining the purpose of the constitutional convention in the deletion referred to we may have reference to the record of the proceedings and debates thereof. *Union Steam Pump Sales Co.* v. *Secretary of State,* 216 Mich 261, 266. The committee of the whole reported to the convention a proposal to re-enact section 1 of the schedule of the Constitution of 1850

---

[*] Schedule, § 2.—REPORTER.

as contained therein.*    A motion to amend said section by striking out the last 3 words was made by Lawton T. Hemans, the reason therefor being expressed therein as follows:

"I move to strike out the words, 'by the legislature' at the end of line 5.

"Mr. Chairman and gentlemen of the convention: I make this motion because it is presumed that a scheme of local self-government for cities and villages will be passed by this convention, and the present charters of such cities and villages should be continued until they are repealed by the action of the local municipality; so far as cities and villages are concerned such laws should be repealed by the municipality and not by the legislature.    It seems to me that that being true these words should be stricken out, so that it could not be construed that the particular charters should be repealed by the legislature."

The proposed amendment was agreed to, presumably for the reason stated by Mr. Hemans.    It may also be noted in passing that the question of initiating by popular petition legislation and amendments to the Constitution was a matter of discussion by the convention, and the view was expressed that the document as framed would be amended in that respect.    Conceivably some members at least might have had in mind not only the reason advanced by Mr. Hemans which was, of course, a sufficient basis for the amendment, but also the possibility of legislation initiated under initiative and referendive provisions to be subsequently added to the Constitution, which action was taken in 1913.†

In view of the reason assigned for striking out the last 3 words there is no basis for any claim of

---

* 1 Proceedings and Debates of the Constitutional Convention, pp 268, 269.

† See Const 1908, art 5, § 1.  See, also, concurrent resolution, PA 1913, p 782, and adoption of amendment, PA 1913, p 793.—REPORTER.

an intention to open the door to legislative action by this Court with reference to the doctrine of governmental immunity, or otherwise. The convention clearly expressed its view that the functions of the 3 departments of government, as specified in the provisions of the Constitution above cited, should be exercised as indicated. Had it been intended to vest this Court with any measure of legislative authority we have no doubt that such intent would have been clearly and unequivocally expressed. The actual situation presented, however, is that nowhere in the fundamental law of the State as adopted by the people in their sovereign capacity is the right to exercise legislative prerogatives granted to the judiciary.

Because of the admitted facts in the present case we are not concerned with the liability of municipalities resulting from acts of negligence of agents or employees engaged in the performance of proprietary, as distinguished from governmental, functions. This Court in *Hodgins* v. *Bay City,* 156 Mich 687 (132 Am St Rep 546), and in other decisions, has recognized the distinction in applicable principles. After referring to such distinction, it is said in 38 Am Jur, Municipal Corporations, § 572, pp 261–263:

"Subject to certain exceptions hereinafter noted, the rule almost universally recognized is that in the absence of statutory provision, there can be no recovery against a municipal corporation for injuries occasioned by its negligence or nonfeasance in the exercise of functions essentially governmental in character. In the exercise of such functions, the municipal corporation is acting for the general public as well as the inhabitants of its territory, and represents in such capacity the sovereignty of the State. No liability attaches to it at common law, either for nonuse or misuse of such power or for the acts or omissions on the part of its officers or

agents through whom such functions are performed, or of the servants employed by agencies carrying out governmental functions of the corporation. This rule is not affected by a statutory or charter provision that the municipality may sue and be sued."

It will be noted that in the language above set forth specific reference is made to the rule of the common law. This Court in a long line of decisions extending back to the earlier cases above cited has uniformly held that in the absence of statute imposing in certain instances liability on municipal corporations for acts of negligence on the part of their agents or employees, the common-law doctrine still applies. The constitutional provisions above referred to require that any change in such respect shall be made by the legislature. Among the decisions recognizing immunity from liability in such cases are: *Brink* v. *City of Grand Rapids,* 144 Mich 472; *Tzatzken* v. *City of Detroit,* 226 Mich 603; *Butler* v. *City of Grand Rapids,* 273 Mich 674; *Royston* v. *City of Charlotte,* 278 Mich 255; and *Penix* v. *City of St. Johns,* 354 Mich 259.

Counsel for appellant admit the present rule of law in this State but ask this Court to summarily change it by abrogating the immunity rule. Like arguments were presented in *Hayes* v. *Cedar Grove,* 126 W Va 828 (30 SE2d 726, 156 ALR 702). In rejecting the argument and sustaining the decision of the trial court in favor of the defendant, it was said (pp 846, 847):

"Whatever may be said for the theory for which the plaintiff contends, loss of immunity of the sovereignty from liability, in its broad application, has not, we think, received the support of the courts; and we question his claim that there is such disposition among the courts of the land. If it exists, we have not been able to find evidence thereof. Be this as it may, believing the doctrine of immunity against

liability to be firmly established by the decided weight of authority, in cases where a municipality is engaged in performing governmental functions, we do not think any change in that rule should be lightly made, especially in cases where the result would affect situations far removed from the particular case at hand. As we have stated, the right to delegate the police power of the State is vested in the legislature, and it may grant or withhold such power as it sees fit, or when granted, impose conditions on its exercise. It seems well settled that, as to municipalities, it may provide that they shall be liable for failure to keep their streets in reasonable repair,— clearly a governmental duty; and if it so desires, it could extend that liability to other governmental activities, including those relating to health and sanitation. It has not chosen to do so, and has left the common law intact. Whether it should do so, is clearly and strictly a legislative prerogative, on which this court is not disposed to encroach. Our function is to apply and interpret legislative enactments—not to enact laws, directly or indirectly. We have no legislative powers, and therefore may not act directly on any matters of legislation. What we are inhibited from doing directly, we should not attempt to do indirectly. This is a sound rule, and should be followed in all situations, especially when the control of the police power of the State, vested in the legislature, is involved. Furthermore, the ruling requested would involve wide and sweeping change, and the effect thereof cannot be gauged. If we say the plaintiff is entitled to recover on the facts stated in his declaration, then liability is created, on similar facts, as to every other municipality in this State; and the principle could, and probably would, be extended to every governmental activity of county courts, boards of education, municipalities, and other authorities to which governmental powers are delegated. If such a fundamental change of our present system is thought to be desirable, it should be brought about through legislative action, and after

the general public, through its representatives in the legislature, has had an opportunity to consider the wisdom thereof, and its effect upon the agencies involved."

In accord with the above decision is *Wickman* v. *Housing Authority of Portland,* 196 Or 100 (247 P2d 630). In affirming a judgment for defendant on the ground that it was engaged in a governmental function and, hence, not liable to respond in damages for alleged negligence, the court rejected the arguments of counsel for appellant in the following terse statement (p 119):

"For us to hold that housing authorities are subject to tort liability would amount to judicial legislation. It is not for this court to legislate, but rather to interpret. If it is desirable that these quasi-municipal corporations be subjected to tort liability, the remedy lies in the legislative assembly; not in the courts."

Among decisions in accord with the foregoing cases are: *Hagerman* v. *City of Seattle,* 189 Wash 694 (66 P2d 1152, 110 ALR 1110); *Kilbourn* v. *City of Seattle,* 43 Wash2d 373 (261 P2d 407); *Scates* v. *Board of Commissioners of Union City,* 196 Tenn 274 (265 SW2d 563); *Kirksey* v. *City of Fort Smith,* 227 Ark 630 (300 SW2d 257, 66 ALR2d 627); *Nissen* v. *Redelack,* 246 Minn 83 (74 NW2d 300, 55 ALR 2d 1428).

Counsel for appellant refer to the Federal tort claims act of 1946 (28 USCA, §§ 1346, 2672) as indicating a governmental tendency to mitigate the application of the doctrine of governmental immunity. It is significant that the act referred to was adopted by the congress. It did not result from court action. In construing the statute the supreme court in *Dalehite* v. *United States,* 346 US 15 (73 S Ct 956, 97 L ed 1427), held that it was not applicable

under the situation presented in the case before it, stating (p 30):

"Turning to the interpretation of the act, our reasoning as to its applicability to this disaster starts from the accepted jurisprudential principle that no action lies against the United States unless the legislature has authorized it."

The legislature of Michigan has recognized its power to modify, in certain fields, the doctrine of governmental immunity as applied to municipal corporations. Thus it has by statute permitted actions to be brought against a township, village, city, or corporation, to recover damages due to a breach of the duty to properly maintain in a condition reasonably safe and fit for travel a public highway, street, bridge, sidewalk, crosswalk, or culvert, over which such defendant has jurisdiction. CLS 1956, § 242.1 (Stat Ann 1958 Rev § 9.591). Likewise by PA 1945, No 127 (CL 1948, §§ 691.151, 691.152 [Stat Ann 1960 Rev §§ 9.1708(1), 9.1708(2)]), the legislature specifically provided that in any civil action brought against a political subdivision or municipal corporation of the State to recover damages based on the negligent operation of a motor vehicle owned by such defendant it should not be a defense that the vehicle was being used in the performance of a governmental function. By PA 1951, No 59 (CLS 1956, § 124.101 *et seq.* [Stat Ann 1958 Rev § 5.3376 (1) *et seq.*]), political subdivisions of the State were authorized to indemnify a policeman in the event of the recovery of a judgment against him based on his conduct while acting within the scope of his authority or within the course of his employment.

It is also significant to note that by PA 1943, No 237, the court of claims act of the State was amended in such manner as to provide in section 24 thereof that upon the happening of any event subsequent

to November 1, 1943, giving rise to a cause of action, the State waived its right to immunity for the torts of its officers and employees, and consented to have its liability determined in accordance with the general rules of law applicable to individuals or corporations. At the session of 1945, by PA No 87, section 24 of the court of claims act as amended at the session of 1943 was repealed. In other words, the legislature of the State waived immunity and then subsequently withdrew such waiver, in effect reasserting the right to invoke the doctrine of governmental immunity.

The authority of the legislature to act with reference to the matter under consideration here has not been challenged. Justice EDWARDS in his opinion expressly recognizes it and also admits the power of the legislature to provide for governmental tort immunity notwithstanding a decree or judgment of this Court abrogating it. He speaks also of a trend toward abolition of governmental immunity from liability for torts committed in the performance of governmental functions, suggesting that such trend has been begun "by this Court and the legislature." Other than cases involving so-called proprietary functions as distinguished from governmental, attention is not directed to any instance in which this Court has heretofore undertaken to modify in any particular the doctrine of governmental immunity as involved in the instant case. Rather, as before suggested, the right of the legislature to act has been repeatedly recognized. Jurisdiction cannot be vested in both the legislative and judicial departments of the State government. Clearly in the legislative field the law-making department alone is empowered to act.

In his dissenting opinion in *Richards* v. *Birmingham School District,* 348 Mich 490, 520, Justice EDWARDS took occasion to say:

·· "The clear-cut remedy to the problem of governmental immunity undoubtedly lies with State legislation of the nature and character of that adopted within recent years by the Federal government through congress. Court action to achieve the same goal by repudiation of this long-established common-law doctrine is hampered by unnumbered precedents and the doctrine of *stare decisis*. It cannot come as can legislative change after ample public discussion and with full warning to those bodies upon whom liability would be thrust to take such measures of an insurance nature as they might deem desirable."

In the same opinion (p 516) he also recognized that:

"The majority of the courts in the 48 States of the United States adhere at present to the basic proposition that the State and its political subdivisions are immune from damage actions arising from tort claims in the absence of ameliorative legislation or proof of proprietary function."

It may also be noted that in *O'Hare* v. *City of Detroit,* 362 Mich 19, decided December 2, 1960, this Court in a unanimous opinion written by Justice EDWARDS recognized the doctrine of governmental immunity but concluded that the legislature by statute imposing the duty to maintain streets and highways in reasonable repair for public travel had enacted a modification of the general rule, and that the case was governed by the exception so created.

It is of vital importance that the division of powers among the 3 departments of State government shall be consistently observed. This Court has done so in the past, and that policy should be continued. The basic principle involved was well expressed by the court of appeals of the State of Virginia in *Ratcliffe* ·v. *Anderson,* 31 Gratt (72 Va) 105, 107 (31 Am Rep 716), as follows:

"It is now too well settled to admit of serious dispute that the legislative department can no more exercise judicial power than that the judicial department can exercise legislative power. Each is supreme in the exercise of its own proper functions within the limits of its authority. The boundary line of these powers is plainly defined in every well-ordered government; and in this country it is now a well-established principle of public law that the 3 great powers of government—the legislative, the executive, and the judicial—should be preserved as distinct from and independent of each other as the nature of society and the imperfections of human institutions will permit. That system which best preserves the independence of each department approaches nearest to the perfection of civil government and the security of civil liberty."

We have cited herein a number of decisions from various States in support of the general principle that in dealing with the doctrine of governmental immunity from damages for tortious acts committed in carrying out governmental functions the legislature alone is clothed with authority to modify, extend or abrogate such doctrine. Additional quotations from such decisions to those above included herein would be merely cumulative and would extend this opinion to an unnecessary length. Unquestionably the overwhelming weight of authority supports the rule that has heretofore obtained in Michigan. Abrogation of that rule by this Court is in excess of the powers vested in the judiciary of the State by the Constitution adopted by the people acting in their sovereign capacity. The practical situation presented is that if the legislature deems it necessary so to do it may act to modify, or even abrogate entirely, the doctrine of governmental immunity. It is also true that the people acting under the initiative provisions of the State Constitution may accomplish a like result by legislation or by constitutional amendment.

The decision of the trial court was right and should be affirmed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

EDWARDS, J. (*for reversal*). From this date forward the judicial doctrine of governmental immunity from ordinary torts no longer exists in Michigan. In this case, we overrule preceding court-made law to the contrary. We eliminate from the case law of Michigan an ancient rule inherited from the days of absolute monarchy which has been productive of great injustice in our courts. By so doing, we join a major trend in this country toward the righting of an age-old wrong. See *Muskopf* v. *Corning Hospital District*, 55 Cal2d 211 (11 Cal Rptr 89, 359 P2d 457); *Molitor* v. *Kaneland Community Unit District No. 302*, 18 Ill2d 11 (163 NE2d 89), cert den 362 US 968 (80 S Ct 955, 4 L ed2d 900); *Hargrove* v. *Town of Cocoa Beach* (Fla), 96 So2d 130 (60 ALR2d 1193).

Few cases could portray the problem with the exactness of the one before us. The plaintiff is the widow of a workman killed by a fall down the elevator shaft of a 6-story building owned and operated by the city of Detroit. The fall occurred while the deceased was employed by a moving company moving furniture out of the building. Plaintiff's declaration alleges that at the time of his death deceased was loading large pieces of furniture on an elevator on the 6th floor and that he stepped or was pushed into an unguarded space 30 inches wide beside the floor of the elevator and fell 100 feet to his death.

The declaration alleges that defendant city of Detroit failed properly to protect and enclose the elevator shaft, in violation of its own ordinances, and that such failure was negligence which caused

her husband's death without any contributory fault on his part. The individual defendants are the commissioner and an inspector of the department of buildings and safety engineering which had charge of enforcement of the ordinance. They are not directly involved in this appeal.

The city of Detroit in its answer denied negligence and claimed contributory negligence on the part of plaintiff's husband. The factual issues thus framed have, of course, never been tried. A motion to dismiss based solely on the theory that the city of Detroit was engaged in a governmental function and hence was immune to suits for ordinary torts was filed by defendant city. The trial judge conducted a hearing at which the basic facts pertaining to the city's operation of the building in question were agreed upon. The trial judge found that the city's operation of the building was a governmental function. Basing his decision squarely on the governmental immunity which Michigan case law has up to this date accorded municipalities, he granted the motion to dismiss.

On appeal, the single question presented is as to whether or not Michigan continues to adhere to governmental immunity from torts.

On appeal, and after briefing and argument, this Court decided to review this doctrine. We, therefore, on our own motion scheduled the case for reargument and invited the attorney general and other interested parties to file briefs, particularly addressing themselves to "the effect, if any, on the doctrine of governmental immunity of legislative enactments in the field of governmental liability—and, secondly, to the distinction, if any should be drawn, between a possible abrogation of governmental immunity as to ordinary torts and governmental freedom from liability for those governmental decisions which lie

specifically within the authorized discretion of the governmental body or agent concerned."

The rehearing has been conducted and a total of 9 briefs has been received and considered. The issues are as clearly posed before us as they ever will be.

The trial judge who dismissed plaintiff's cause of action below accurately stated (as of the time of his decision), "the doctrine of governmental immunity is still the law of Michigan." A review of Michigan cases on the topic would include: *City of Detroit* v. *Blackeby*, 21 Mich 84 (4 Am Rep 450); *Nicholson* v. *City of Detroit*, 129 Mich 246 (56 LRA 601); *Daszkiewicz* v. *Detroit Board of Education*, 301 Mich 212; *Martinson* v. *City of Alpena*, 328 Mich 595; *Richards* v. *Birmingham School District*, 348 Mich 490; *Penix* v. *City of St. Johns*, 354 Mich 259; *Jourdin* v. *City of Flint*, 355 Mich 513.

The last 3 of these cases, however, serve to show growing dissatisfaction in this Court with the doctrine. In the *Richards Case,* the desirability of legislative attention to this problem was pointed out (p 520):

"The clear-cut remedy to the problem of governmental immunity undoubtedly lies with State legislation of the nature and character of that adopted within recent years by the Federal government through congress. Court action to achieve the same goal by repudiation of this long-established common-law doctrine is hampered by unnumbered precedents and the doctrine of *stare decisis.* It cannot come as can legislative change after ample public discussion and with full warning to those bodies upon whom liability would be thrust to take such measures of an insurance nature as they might deem desirable."

Four years have passed since then without legislative action. The legislature has, of course, every

right to say to us, "The courts created this problem. The courts can solve it."

·· Since our consideration of immunity in the *Richards Case,* a number of State supreme courts have acted in this field. Supreme courts in Florida, Illinois, and California have squarely rejected the doctrine of governmental immunity. *Hargrove* v. *Town of Cocoa Beach, supra; Molitor* v. *Kaneland Community Unit District No. 302, supra; Muskopf* v. *Corning Hospital District, supra.*

· In the most recent of these cases, the California supreme court said:

"After a re-evaluation of the rule of governmental immunity from tort liability we have concluded that it must be discarded as mistaken and unjust. * * * The rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia. * * * Only the vestigial remains of such governmental immunity have survived; its requiem has long been foreshadowed. * * * In holding that the doctrine of governmental immunity for torts for which its agents are liable has no place in our law we make no startling break with the past but merely take the final step that carries to its conclusion an established legislative and judicial trend." *Muskopf* v. *Corning Hospital District,* 55 Cal2d 211, 213, 216, 221 (11 Cal Rptr 89, 90, 92, 95, 359 P2d 457).

It is interesting to note that in Michigan, too, we here complete a trend begun both by this Court and the legislature.

The legislature has specifically imposed liability upon political subdivisions for keeping streets and highways reasonably fit and safe for travel. CLS 1956, § 242.1 (Stat Ann 1958 Rev § 9.591).

It has much more recently exempted from the immunity rule negligence actions against political subdivisions of the State pertaining to motor ve-

hicles.  CL 1948, §§ 691.151, 691.152 (Stat Ann 1960 Rev §§ 9.1708[1], 9.1708[2]).

In the court of claims act, it has applied the same exemption from the judicial immunity rule to the State itself as to torts arising from motor-vehicle or aircraft accidents.  PA 1960, No 33, amending CL 1948, § 691.141 (Stat Ann 1959 Cum Supp § 27.3548 [41]).*

Moving somewhat in the same direction, this Court has adopted the expedient of refusing the immunity rule to governmental units where the activity engaged in was of a revenue-producing or "proprietary" nature.  *Hodgins* v. *Bay City,* 156 Mich 687 (132 Am St Rep 546); *Foss* v. *City of Lansing,* 237 Mich 633 (52 ALR 185); *Matthews* v. *City of Detroit,* 291 Mich 161.

The trend toward responsibility is pictured with a much wider horizon at the conclusion of Borchard's historic treatise (36 Yale LJ 1039, 1099, 1100):

"The whole course of history, with slight though frequent interruptions, has been toward responsible government, that is, responsible toward those for whose benefit and needs it presumably exists.  If this has gradually tended toward evolving legal conceptions by which to judge the acts of those in authority, this is a reflection of modern political development.  Force and arbitrariness are thus limited by rule, rule administered by societal agents, usually courts, judicial or administrative.  *  *  *  If, in property and contract relations, definite rules have been evolved in most States for determining the relations between the government and the governed, and if foreign countries, for the most part, bring tort relations into the same legal orbit, there seems no valid reason why the United States should continue to employ antiquated postulates as if they constituted reasons in order to escape what the rest of

---

* See, also, PA 1961, No 236, § 6475 (Stat Ann § 27A.6475).

the world regards as both moral and legal obligations."

These trends would, of course, avail the present plaintiff nothing. If the doctrine of governmental immunity from torts is to continue as it has existed in Michigan, she plainly cannot maintain her suit.

Indeed, at the outset, it is suggested that she cannot, because this Court has no power to change or alter the common law. In this regard, reliance is had upon the language of the Michigan Constitution of 1850, section 1 of the schedule:

"The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations or are altered or repealed by the legislature."

This same language was indeed re-enacted in the Michigan Constitution of 1908, section 1 of the schedule, but with a most significant omission:

"The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed."

Reference to the legislature in the preceding (1850) section,* which might be read as depriving this Court of all power to alter a rule of common law, was thus specifically deleted. Clearly, the Constitution presents no barrier to removal of an unjust rule —by the action of the Court which made it.

From all that has been presented to us, we glean no substantial argument for depriving this widow of her right to have a jury determine whether or

---

* It should be noted that even this type of "reception" clause has not prevented judicial review and modification of common-law doctrines. See *Penny* v. *Little* (1841), 3 Scam (4 Ill) 301; *Will of Wehr* (1945), 247 Wis 98 (18 NW2d 709); *Wilkins* v. *Jewett* (1885), 139 Mass 29 (29 NE 214); *Woods* v. *Lancet* (1951), 303 NY 349 (102 NE2d 691, 27 ALR2d 1250).

not defendant city of Detroit negligently caused her husband's death without contributory fault on his part.

There is, of course, no question but that she would have this right if the building in question had been owned by an individual or by a private corporation.

The chief legal argument pertains to the desirability of rigid application herein of the doctrine of *stare decisis*. As to the fundamental nature of this doctrine, we entertain no doubt. The common law, as we know it in this country and Great Britain, is founded upon the following of case precedent. By this rule, our society preserves the best of the wisdom and morality of past ages.

But *stare decisis* in its most rigorous form does not prevent the courts from correcting their own errors, or from establishing new rules of case law when facts and circumstances of modern life have rendered an old rule unworkable and unjust.

In his introduction to a symposium on governmental tort liability, Dean Stason noted the vitality of the doctrine—the king can do no wrong—and commented (29 NYU L Rev 1321–1324):

"Yet the law does change. The legal system provides not only for stability, so that men will, in their actions of today, be able to rely upon the rules of yesterday, but also it includes a mechanism permitting the effectuation of changes to meet the changed conditions of tomorrow. And certainly one of the changes taking place today, not only in the United States but also in many of the other countries of the world, is a transition from individualism to collective security—and this includes an assumption by the body politic of much of the devastation created by all manner of individual tragedies, whether due to accident, or disease, to an act of God, or of the State, or of man. A part and parcel of this

trend is the gradual expansion of the tort liability
of the State.   *   *   *

"One could go on and on, demonstrating the great
vitality shown in recent years by the private law of
torts, ever expanding to meet new needs, and, es-
pecially growing apace to spread the losses occa-
sioned by the injuries more or less inevitably
arising out of a complex, technological, and ever
more mechanized society.  Naturally, a heavy bur-
den is placed on defendants, and if it were not for
the protection of casualty insurance, many business
enterprises would certainly find the going to be
hazardous and perhaps impossible.  But insurance
is another way of spreading the risk, performing a
function akin to that of the tax roll that assumes
the burden in case of public liability.  The trend
then, in private tort law, is markedly in the direction
of spreading the burden of losses so that injured
parties will not be left without relief.

"There is no reason to anticipate any different
trend in those phases of tort law that relate to public
liability for injuries caused by the State and its sub-
divisions.  The expansion will not be so rapid.  Fear
of 'an infinity of actions' milking the public treasury
gives pause to legislatures as well as to courts.  But
other nations are doing it without bankruptcy, and
so will we, give us time."

The classic answer to those who would regard
*stare decisis* as an immutable rule requiring the
courts to set their course by the frozen compass of
the ancient past is that given by Mr. Justice Oliver
Wendell Holmes:

"It is revolting to have no better reason for a rule
of law than that so it was laid down in the time
of Henry IV.  It is still more revolting if the grounds
upon which it was laid down have vanished long
since, and the rule simply persists from blind imita-
tion of the past."  Oliver Wendell Holmes, Collected
Legal Papers (1920), p 187.

The rule of governmental immunity has as legal defense only the argument that age has lent weight to the unjust whim of long-dead kings. It is hard to say why the courts of America have adhered to this relic of absolutism so long a time after America overthrew monarchy itself!

The unsatisfactory answers available to this question (which we will not repeat) have been explored at length by legal authorities with practical unanimity of condemnation of the immunity rule as applied to ordinary torts. Borchard, Government Liability in Tort, 34 Yale LJ 1, 129, 229; Borchard, Governmental Responsibility in Tort, 36 Yale LJ 1, 757, 1039; Fuller and Casner, Municipal Tort Liability in Operation, 54 Harvard L Rev 437; Leflar and Kantrowitz, Tort Liability of the States, 29 NYU L Rev 1363.

It is a fascinating quirk of legal history that England, the land which gave this doctrine birth, has retained a vestigial monarchy; but English courts have for generations allowed tort actions against municipalities and school districts. *Lyme Regis* v. *Henley* (1834), 2 Clark & F 331 (6 Eng Rep 1180, 1 Eng Rul Cas 601); *Shrimpton* v. *Hertfordshire County Council* (1911), 104 Law Times Rep 145 (2 NCCA 238); *Ching* v. *Surrey County Council,* [1910] 1 KB 736 (79 LJ KB 481, 2 NCCA 229); *Morris* v. *Carnarvon County Council,* [1910] 1 KB 840 (79 LJ KB 670, 2 NCCA 234); *Smith* v. *Martin and the Corporation of Kingston-Upon-Hull,* [1911] 2 KB 775 (80 LJ KB 1256, 2 NCCA 215).

If we examine the practical arguments advanced against change of this rule, we find, if anything, even less substance. Each brief speaks of the crushing weight of negligence awards which might bankrupt a small governmental unit. Most of the briefs filed to support appellee city avoid mention of public liability insurance as if it were a new and barely

tried invention of which the courts could not possibly have knowledge.

No such scheme for prepaying and sharing risk did exist in any common form at the time when the courts of this country adopted the doctrine of governmental immunity. The probabilities are strong that this fact, and the possibility of a crushing liability falling upon a small governmental unit, had as much to do with adoption of the rule as did *stare decisis* and the fact that kings had no inclination to be liable in damage to their subjects.

In 1961, however, liability insurance is no new and untried device. We take judicial notice that it serves private citizens and private corporations as a means of prepaying and sharing just the sort of unexpected burden with which we deal in this case.

This Court has just heard and rejected this same practical argument in relation to hospitals in this State. *Parker* v. *Port Huron Hospital,* 361 Mich 1. Many of the smaller Michigan hospitals, absent liability insurance, would, of course, be much harder pressed by abolition of charitable immunity than any governmental unit in Michigan will be by this decision. In abolishing the doctrine of charitable immunity, this Court not only took judicial notice of the change of circumstance represented by the availability of public liability insurance, but also made the decision prospective in effect under the *Sunburst* doctrine of the United States supreme court (*Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 US 358 [53 S Ct 145, 77 L ed 360, 85 ALR 254]). This was done in order to give notice of the change and enable the hospitals to protect themselves in advance.

In this case we follow the same course for the same reasons in relation to the previously immune governmental units. We do not ignore the fact that this decision cast in this form will, of course, occa-

sion some minor increase in the tax burden due to
purchase of insurance. It would also serve to assure
each taxpayer that if by chance a catastrophe befell
him as a result of an ordinary tort committed by a
public employee, the economic impact thereof would
be shared with all other insureds, rather than falling
with awesome tragedy upon the innocent victim
alone.

Nor do we ignore the fact that some such victims
must exist whose causes of action are barred by the
prospective nature of this order and that as to them
this decision affords no relief from the previous
unjust doctrine. Such differences are created by
every change in case law (or statutory law for that
matter). If this decision were not to be made pro-
spective in its nature, its application would still fail
to remedy the problem of the persons whose cause
of action accrued 3 years and 1 day ago. CLS 1956,
§ 609.13 (Stat Ann 1959 Cum Supp § 27.605). Each
case of great public concern presents hard choices.
We believe prospective abrogation of the judicial
doctrine of governmental immunity accomplishes the
nearest approach we have available to a just and
common-sense solution of a great problem which has
festered in the courts for years.

We deal in this case with a declaration which
would clearly state an ordinary tort claim against
a private individual or a private corporation.* Our
holding herein is limited to the statement that there
is no longer any judicial doctrine of governmental
immunity *as to such a claim.*

There is, of course, no doubt of legislative au-
thority to act in this area. The Michigan legislature
may, if it sees fit to do so, reinstitute governmental

---

* *Cf.* "The United States shall be liable, respecting the provisions
of this title relating to tort claims, in the same manner and to the
same extent as a private individual under like circumstances." 28
USCA, § 2674 (Federal tort claims act).

tort immunity by statute. Or, as it has already done in some instances, it may specify the terms and conditions of suit. Our holding in this case does not affect any existing statute in the field concerned, or imply any limitation on legislative power to act where to date it has not acted.

Also, there are and will continue to be many situations in relation to which real or fancied grievances exist where governmental freedom from liability will persist on wholly different grounds. Legislative bodies, for example, have the right to make many types of decisions which may do harm to some. Subsequent history may clearly demonstrate that some of those decisions were wrong. Discretion implies the right to be wrong. So long as those decisions are within the discretion vested in the legislative body, there is clearly neither breach of duty nor a right to damages. The instant case, a tort action, does not in any manner alter the fact that actions or decisions of a legislative, executive, or judicial character which are performed within the scope of authority of the govermental body or officer concerned continue to enjoy freedom from liability.

The people place great powers of decision making in the hands of their government. In the exercise of discretionary power, governmental duty runs to the benefit of the whole public, rather than to individuals. It is of great importance that this crucial function of democratic decision making be unhampered by litigation.*

---

* "Government officials are liable for the negligent performance of their ministerial duties * * * but are not liable for their discretionary acts within the scope of their authority, * * * even if it is alleged that they acted maliciously. * * * Such immunity is not designed to protect the guilty, for 'if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its

No such considerations are involved in the area of ordinary tort actions. As we have indicated, we see no legal, practical, or moral justification for continuation of the court-decreed doctrine of governmental immunity from such actions. To the extent we have indicated, we hereby overrule that doctrine and the preceding Michigan case law which was founded thereon.

Few, if any, important changes in case law are made without some disagreement. Nor will this be. Mr. Justice CARR concedes that the doctrine of governmental immunity was created by judge-made case law and was made applicable to this State by this Court. His opinion cites no statutory provision upon which this doctrine rests—because there is none. Nor does he defend the doctrine itself. In effect, he suggests that once judicial error has gained the respectability of age, it becomes somehow invulnerable to correction by the branch of government which made it.

This argument, although by no means novel, has the weight of legal opinion and precedent against it. Indeed, it is the peculiar genius of the common law that no legal rule is mandated by the doctrine of *stare decisis* when that rule was conceived in error or when times or circumstances have so changed as to render it an instrument of injustice. See, on this topic, *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697); *Sheppard* v. *Michigan National Bank,* 348 Mich 577, 595 *ff; Park* v. *Employment Security Commission,* 355 Mich 103, 138 *ff,* 141 *ff;*

---

outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. * * * In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' Learned Hand, J., in *Gregoire* v. *Biddle,* 177 F2d 579, 581." *Muskopf* v. *Corning Hospital District,* 55 Cal 2d 211, 220, 221 (11 Cal Rptr 89, 94, 95, 359 P2d 457).

*Girouard* v. *United States,* 328 US 61 (66 S Ct 826, 90 L ed 1084) ; *Brown* v. *Board of Education of Topeka,* 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180) ; *Woods* v. *Lancet,* 303 NY 349 (102 NE2d 691, 27 ALR2d 1250) ; Blaustein & Field, "Overruling" Opinions in the Supreme Court, 57 Mich L Rev 151 (December, 1958) ; William O. Douglas, Stare Decisis, 49 Col L Rev 735.

The highest appellate court of New York recently dealt with a similar argument:

"Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it [citing cases]. * * * It is the duty of the court to bring the law into accordance with present day standards of wisdom and justice rather than 'with some outworn and antiquated rule of the past.' * * * We act in the finest common-law tradition when we adapt and alter decision law to produce common-sense justice." *Woods* v. *Lancet, supra,* 354, 355.

In a case wherein all the same arguments of adherence to precedent were rejected, this Court unanimously overruled the long-established doctrine of imputed negligence. The unanimous opinion of the Court which dealt at length with the problem which divides us here quoted reasoning which fits our present case. The opinion in *Bricker* v. *Green, supra,* 234, 235, said:

"Mr. Justice Cardozo, in his William L. Storrs Lectures before the Law School of Yale University in 1921, had this to say, as printed in his book, entitled, 'The Nature of the Judicial Process,' pp 142, 150–152:

" 'But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent

with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in *Dwy* v. *Connecticut Co.*, 89 Conn 74, 99 (92 A 883, LRA1915E, 800, Ann Cas 1918D, 270), express the tone and temper in which problems should be met:

" ' "That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature." '

" 'If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.'

"Ever since 1872 we have adhered to the imputed negligence rule. We have recognized from time to time the changes brought about by the innovations of science and engineering, and we have carefully considered at much length the implications of

the rule, its application, and the effect of its abandonment. As a result of our study and observation we are convinced that in the long run the application of the rule is more harmful than helpful and results in more injustice than it prevents; and that we should not continue the invariable application of the so-called imputed negligence rule merely and solely on the ground that the injured person was a voluntary, gratuitous passenger in an automobile, the driver of which was guilty of negligence which was a contributing proximate cause of an accident and injury to such passenger."

In the present case, we conclude likewise that in relation to the doctrine of governmental immunity, "the application of the rule is more harmful than helpful and results in more injustice than it prevents."

One of the opinions in this case while agreeing with our fundamental holding that the immunity rule as applied below represents historic injustice and should be overruled prospectively, criticizes the fact that we seek to follow the precedent set in *Parker* v. *Port Huron Hospital,* 361 Mich 1, and to apply the overruling likewise to this case in which the decision is being made.

The choice in this regard is, of course, difficult— but it is deliberate. We have pointed out that any date or point of change involves the application of the old (and unjust) rule to some, and its alteration as to others. This Court has overruled prior precedent many times in the past. In each such instance the Court must take into account the total situation confronting it and seek a just and realistic solution of the problems occasioned by the change.

In overruling the imputed negligence rule in *Bricker* v. *Green,* 313 Mich 218 (163 ALR 697), the Court applied the new rule to the case at bar and to "pending and future cases", p 236.

In shifting the burden of proof as to contributory negligence from plaintiffs to defendants, this Court adopted a rule change wholly prospective in its operation and effective "in all negligence cases tried after the effective date hereof". This date was set 1–1/2 months ahead to allow for adequate notice to the bar and time to amend pleadings in pending cases. Court Rule No 23, § 3a (1945).*

In holding that, contrary to prior precedent, interest should be payable on workmen's compensation awards from the date when the claim should have been paid, this Court applied the overruling to the case at bar but stated "This decision shall not, however, be regarded as retroactive." *Wilson* v. *Doehler-Jarvis,* 358 Mich 510, 517.

And in *Parker* v. *Port Huron Hospital, supra,* 28,† this Court overruled the doctrine of charitable immunity in the case at issue and otherwise gave the new rule effect as of the date of decision.

It is evident that there is no single rule of thumb which can be used to accomplish the maximum of justice in each varying set of circumstances. The involvement of vested property rights, the magnitude of the impact of decision on public bodies taken without warning or a showing of substantial reliance on the old rule may influence the result.

In no instance which we have discovered, however, has this Court's decision taken the benefit of the change from the party whose case occasioned it— even though retroactivity may have been limited to a greater or lesser degree.

---

* Added April 14, 1958, 352 Mich xiv.—Reporter.

† Recently the Wisconsin supreme court, by unanimous decision, has cited and relied upon *Parker* v. *Port Huron Hospital, supra,* in overruling Wisconsin's charitable immunity doctrine prospectively except as to the case before the court. *Kojis* v. *Doctors Hospital,* 12 Wis2d 367 (107 NW2d 131); supplemental opinion, 12 Wis2d 367 (107 NW2d 292).

The reasons for denying general retroactivity in this case we have already discussed. The reasons for including the case which occasioned the change lies in the court's basic interest in preserving the vitality of the common law. The parties and lawyers who are certain of defeat for a lawsuit may well be deterred from bringing the appeal which would best illustrate the need for alteration of a rule. Nor (assuming some prosperous law offices might undertake such litigation as a matter of public service or long range self-interest), should we limit the presentation of precedent-making cases to a particular classification of attorneys.

It should be noted that both *Parker* v. *Port Huron Hospital* and this case involve single-injury problems. In the *Molitor Case* the supreme court of Illinois applied the *Sunburst* prospective overruling doctrine, and also allowed recovery in the case establishing the change. This case, however, involved a situation wherein 18 students had been in the same bus accident. While we follow the same principle as *Molitor* in this single-injury situation we do not bind ourselves to the same result in a multiple-injury situation.

The *Molitor Case,* of course, presented the most dramatic opportunity possible for arguing denial of equal protection. The father who had prevailed in the principal case in the Illinois supreme court on behalf of 1 son presented the constitutional argument on behalf of another son also injured in the same accident whose suit was dismissed. Although not conclusive of the legal issue it is interesting to note that certiorari was denied. *Molitor* v. *Kaneland Community Unit District No. 302,* 18 Ill2d 11 (163 NE2d 89); certiorari denied 362 US 968 (80 S Ct 955, 4 L ed2d 900).

There is, of course, ample precedent not only in Michigan but elsewhere for prospective overruling

with the new rule applied to the case in which decision is made. *Dooling* v. *Overholser,* 100 App DC 247 (243 F2d 825); *Shioutakon* v. *District of Columbia,* 98 App DC 371 (236 F2d 666, 60 ALR 686); *Durham* v. *United States,* 94 App DC 228 (214 F2d 862, 45 ALR2d 1430); *Farrior* v. *New England Mortgage Security Co.,* 92 Ala 176 (9 So 532, 12 LRA 856); *Haskett* v. *Maxey,* 134 Ind 182 (33 NE 358, 19 LRA 379); *Charles H. Dauchey Co.* v. *Farney,* 105 Misc 470 (173 NYS 530); *Kojis* v. *Doctors Hospital, supra.*

Finally, it is suggested that the *Sunburst Case* (*Great Northern R. Co.* v. *Sunburst Oil & Refining Co., supra*) is authority for rejecting Mrs. Williams' plea for damages for her husband's death. We believe that the opinion of Mr. Justice Cardozo for the United States supreme court has much broader significance than mere ratification of the Montana supreme court's decision to change a rule wholly prospectively. Levy, Realistic Jurisprudence and Prospective Overruling, 109 U Penn L Rev 1 (November, 1960). The question, as to whether or not the Montana court could have applied the otherwise prospective ruling to the case at bar (as we seek to do here) was not presented, discussed or decided. But the thrust of the Cardozo opinion may be found in the following quotation which we read as affirming the power of a State supreme court in overruling prior precedent to apply the most practical and most just solution it has available under the circumstances presented by that case.

"This is a case where a court has refused to make its ruling retroactive, and the novel stand is taken that the Constitution of the United States is infringed by the refusal.

"We think the Federal Constitution has no voice upon the subject. A State in defining the limits of adherence to precedent may make a choice for itself

between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law nonetheless for intermediate transactions. * * * On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. *Tidal Oil Co.* v. *Flanagan,* 263 US 444 (44 S Ct 197, 68 L ed 382); *Fleming* v. *Fleming,* 264 US 29 (44 S Ct 246, 68 L ed 547); *Central Land Co.* v. *Laidley,* 159 US 103, 112 (16 S Ct 80, 40 L ed 91); see, however, *Montana National Bank of Billings* v. *Yellowstone County,* 276 US 499 (48 S Ct 331, 72 L ed 673). The alternative is the same whether the subject of the new decision is common law (*Tidal Oil Co.* v. *Flanagan, supra*) or statute. *Gelpcke* v. *Dubuque,* 1 Wall ([68 US] 175 [17 L ed 520]); *Fleming* v. *Fleming, supra.* The choice for any State may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts. The State of Montana has told us by the voice of her highest court that with these alternative methods open to her, her preference is for the first. In making this choice, she is declaring common law for those within her borders. The common law as administered by her judges ascribes to the decisions of her highest court a power to bind and loose that is unextinguished, for intermediate transactions, by a decision overruling them. As applied to such transactions we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew. Accompanying the recognition is a prophecy, which may or may not be realized in conduct, that transactions arising in the future will be governed by a different rule. If this is the common-law doctrine of adherence to

precedent as understood and enforced by the courts of Montana, we are not at liberty, for anything contained in the Constitution of the United States, to thrust upon those courts a different conception either of the binding force of precedent or of the meaning of the judicial process." *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 US 358, 364–366 (53 S Ct 145, 77 L ed 360, 85 ALR 254).

For reasons set forth above, this case should be reversed and remanded for trial.

TALBOT SMITH, KAVANAGH, and SOURIS, JJ., concurred with EDWARDS, J.

BLACK, J. *(for affirmance).* When a court of last resort divides according to what the reading public looks upon as political lines, the lone writer of a separate or distinct opinion usually finds himself a sort of rogue in the eyes of his divisively lined up Brethren. He is supposed—so I twig—to join one team or the other; failing which the dainty vestments of delicate ostracism are primly cast upon him. In this epochal case of Williams I accept the role cheerfully, doing so with the uninhibited philosophy of the English lawyer-novelist, Sir Anthony Hope Hawkins:

"For my part, if a man must needs be a knave I would have him a debonair knave, . . . It makes your sin no worse, as I conceive, to do it *a la mode* and stylishly." The Prisoner of Zenda, pp 97, 98.

Once again 2 widely divided opinions are presented by familiarly grouped extremities of the Court. Justices CARR, KELLY, and DETHMERS, looking on *stare decisis* as set and cured legal concrete, stand as before against any doctrine of judicial self-correction.[1] Justice EDWARDS and his votaries, miscon-

---

[1] Seemingly, the veterans of this Court look upon judicial sin of the past as was the sin of Judah: "written with a pen of iron, and with the point of a diamond." Jeremiah, 17:1.

ceiving and so misapplying what the supreme court affirmed in the *Sunburst Case* (*Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 US 358 [53 S Ct 145, 77 L ed 360, 85 ALR 254]), would in this distinct field of municipal law discriminate grossly against all similarly situated plaintiffs whose luck is that of having lost to one of their class the race to a long overdue judicial decision. Conversely, these last mentioned Brethren would discriminate against the present defendant (Detroit) in favor of all other similarly situated municipal defendants who, by luck or calculated delay, have succeeded in preventing their plaintiff adversaries from winning the same race. (For a perfect illustration of this, see the conflicting opinions of *Browning* v. *Paddock,* 364 Mich 293.)

Again, as in *Lyons* v. *Employment Security Commission,* 363 Mich 201, 228, I differ *toto caelo* with both opinions, tendering instead the view that any majority determination to cast aside the rule of municipal immunity should be effected either by *wholly* prospective decision or *wholly* retrospective decision. For reasons to be stated, I favor the former; hence this vote to affirm.

FIRST: THE OPINION PROPOSED BY
MR. JUSTICE CARR

Little time need be spent in determining whether the strict doctrine of municipal immunity from tort liability should be repudiated. All this is old straw. The question is not "Should we?"; it is "How may the body be interred judicially with nondiscriminatory last rites?" No longer does any eminent scholar or jurist attempt justification thereof. All unite in recommendation of corrective legislation. See the trenchant conclusions of Professors Smith[2] and

[2] Now Dean of the Law School of the University of Michigan.

Lloyd[3], quoted at conclusion of this opinion. As in *Park* v. *Employment Security Commission*, 355 Mich 103, 141, the doctrine looks in vain around our conference table for a defender of its once alleged merit. The elder Brethren say only that the rule *stare decisis* is—by our constitutional schedule—fortified to the impregnable and that this Court upon oath must continue to apply it until the legislature wills otherwise. The provision to which we are referred appears in the margin.[4]

So we enter again upon a perennial controversy: Whether a judge should let others "long dead and unaware of the problems of the age in which he lives do his thinking for him." (Mr. Justice Douglas, Stare Decisis, 49 Columbia L Rev, 735, 736.) My answer to this question was written in *City of Dearborn* v. *Bacila*, 353 Mich 99, 112, 113:

"Mr. Justice Holmes, commenting on 'The Path of the Law,' leads the thought-way here. He said (Collected Legal Papers, Oliver Wendell Holmes, p 187):

" 'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.'

"The late and distinguished Judge Frank (of the second Federal judicial circuit) follows the path of Holmes this way:

" 'Especially are professional or other groups of specialists addicted to set ways. Even the natural scientists, presumably inspired by the spirit of intellectual adventuring, are by no means free of stick-

---

[3] Congdon Professor of Public Law and Legislation, Syracuse University College of Law.

[4] "Sec. 1. The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed." Const 1908, schedule, § 1.

in-the-mudism.  The medical profession is almost as much precedent-ridden as the legal.  Partly such devotion to past ways involves a sort of ancestor worship; veneration for one's predecessors is often given as a reason for sticking to precedents.  Partly it involves pride: Judges, like doctors and others, are reluctant to admit they made mistakes.  *Then, too, there is plain old-fashioned animal laziness.  It's a nuisance to revise what you have once settled.*  Out of such laziness comes what Holmes called "one of the misfortunes of the law," that "ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." '  (Courts On Trial, by Jerome Frank, Princeton University Press, 1949, pp 272, 273.)"

Surely, with the passage of years, today's question is become a game of quasi-legal basketball with legislators and judges tossing the sphere back and forth with neither making visible effort to loop it for decisive result.[5]  It is time one branch or the other act affirmatively and, since the legislature with

---

[5] Attached as an appendix to the appellant's first brief in *Bricker* v. *Green*, 313 Mich 218 (163 ALR 697), is an illustrative letter written by a then and present member of the house of representatives to Bar-Committee Chairman Miles K. Benedict (a participant in the *Bricker Case* as shown on page 225 of the report).  It shows all too clearly what happens when lobby-opposed bills are offered in the legislature to correct common-law errors of the courts.  The complete letter (Representative Phillips writing) reads:

"This is in reply to yours of recent date regarding the imputed negligence bill.  You will recall that I went along with the St. Clair County Bar Association at the last session in regards to this bill.  I am convinced personally that the imputed negligence law is a bad thing and will vote against the law at every opportunity.  However, the bill abolishing the imputed negligence law has always been opposed by the insurance lobby.  They claimed 2 years ago that the legislature had nothing to do with making the law and it is not up to us to repeal it.

"They tell me that if it is as bad as the lawyers say it is, the Court would repeal it and that it should be left up to the Court.  This is an argument I don't know how to answer and I would like you to tell me what the answer is.  Unless there is some answer to it, I don't believe there is any chance that the legislature will take action to repeal the law."

Yes, indeed, let us refer—again and again and again—the municipally tort-injured to the legislature for relief.

over-borrowed time has done nothing, this Court should force the issue as other courts have done and are now doing. Then and then only may the people· expect what all have a right to expect, that is, prompt if prodded legislation which lifts from the individual the total burden arising from what is now court-licensed negligence and yet reasonably protects the municipality from unbearable diversions of municipal tax revenues. The only alternative is inertia and cozy complacence in our lofty quarters as "the· rule of law" burns slowly to utter public disrespect.

What indeed are judges to do as inexcusable injustice continues unremittingly before their very eyes; injustice occasioned by the over-protracted life of a rule made at common law by judges who· knew naught of modern elevators and like appliances which, being negligently constructed or maintained by public authority, cause repetitious sufferings—as. here—of totally innocent victims? Are judges powerless to act, as year after year goes by with primarily responsible legislators standing by, totally disinterested or politely amused at the plight of the courts?

The right answer is the same as given by life's teachings, teachings which are no stranger to the· law. Action of any kind is always better than total inaction. Sins of cold-blooded omission invariably average out to greater error than sins of warm-hearted commission. As Dante tells us, the two will be weighed in different scales when the great day of Final Judgment arrives in our Highest Court.

Such is the ground from which previous like declarations have been made. *"Stare decisis* is usually the wise policy"; yet it "is not inflexible." "Whether· it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided." "This Court, unlike the House of Lords,.

has from the beginning rejected a doctrine of disability at self-correction." "It is a persuasive but not necessarily controlling factor and, in the language of text-amended American Jurisprudence, 'must give way to overriding considerations under cogent circumstances.'" Quotations from separate opinion of *Park* v. *Employment Security Commission, supra,* pp 145–150.

Why a decision to overrule any grievously unjust rule—of the common law—should occasion so much pain is difficult of perception. Has *stare decisis* always been that strong in our quarters? Conceding that Michigan is usually the last of all laggard-stragglers to get into line as the judicial process marches toward the future,[6] I seem to recall, as a then participant of sorts, that Mr. Justice CARR signed the Court's unanimous opinion of *Bricker* v. *Green, supra,* without questioning in that eventful case this Court's constitutional power to overrule or set aside a rule of the common law. Therein, unless I have a different set of Michigan Reports than does my Brother, one finds that the Court unreservedly committed itself to Justice Cardozo's view[7] of *stare decisis,* ending with this deathless expression:

"If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." (p 235)

---

[6] Consider, as examples, this Court's quarter-century delay after Wisconsin, the 47th state to get in step, finally repudiated the totally indefensible doctrine of imputed negligence (*Reiter* v. *Grober,* 173 Wis 493 [181 NW 739, 18 ALR 362]; *Lachow* v. *Kimmich,* 263 Mich 1–5 [90 ALR 626, 32 NCCA 579], opinion of MACDONALD, J.; *Bricker* v. *Green, supra*), and our last-ditch hold out against elimination of the burden of disproof of contributory negligence (for details of this last, see *Bacila* v. *Dearborn, supra,* 110–117).

[7] Cardozo, The Nature of the Judicial Process, p 152.—REPORTER.

(Justice Carr must have been more than willing—yes, eager—to sign this *Bricker* opinion since he was not a member of the Court when the case was finally submitted June 5, 1945. See 312 Mich iii.)

The reader will find further that this newborn doctrine of constitutional disability of self-correction did not occur to the veteran cult of the Court when confession was offered and absolution obtained in *Romatz* v. *Romatz,* 355 Mich 81, and *Spoon-Shacket Company, Inc.,* v. *Oakland County,* 356 Mich 151; also that this allegation of constitutionally dictated *stare decisis* was made the first time, not in this case of Williams but in subsequently submitted *Wardlow* v. *City of Detroit,* 364 Mich 291, and *Sayers* v. *School District,* 366 Mich 217, respectively. It is a long recumbent afterthought which the very constitutional provision in question, by its express and significant elimination of the words "by the legislature," effectively repudiated 52 years ago. See the constitutional convention's "Address to the People" and explanatory comment appearing therein under section 1 of the schedule, p 38.[8]

Actually, this business of looking on *stare decisis* as if it were case-hardened *res judicata* proves again what Professor Rodell once said of law when judges stunt its growth:

"The law is the killy-loo bird of the sciences. The killy-loo, of course, was the bird that insisted on flying backward because it didn't care where it was going but was mightily interested in where it had been. And certainly The Law, when it moves at all, does so by flapping clumsily and uncertainly along, with its eye unswervingly glued on what lies behind." Rodell, "Woe Unto You, Lawyers!", ch 2, p 23, Rey-

8 Debates, Constitutional Convention, p 1443.—Reporter.

nal & Hitchcock, p 20, Pageant Press, Inc., New York City.[9]

It proves, too, the accuracy of Justice Cardozo's wisdom when he wrote "The Growth of the Law" (pp 132–134):

"Some months ago the *New York Law Journal* published letters of its readers, some in praise, some in criticism, of a decision recently announced. The critics, or some of them, went upon the theory that the rule of *stare decisis* was imbedded in the Constitution, and that judges, when they departed from it, were usurpers, though the precedent ignored was as mouldy as the grave from which counsel had brought it forth to face the light of a new age. *Stare decisis* is not in the Constitution, but I should be half ready to put it there, and to add thereto the requirement of mechanical and literal reproduction, if only it were true that legislation is a sufficient agency of growth.  *   *   *  Substitute statute for decision, and you shift the center of authority, but add no quota of inspired wisdom. If legislation is to take the place of the creative action of the courts, a legislative committee must stand back of us at every session, a sort of supercourt itself. No guarantee is given us that a choice thus made will be wiser than our own, yet its form will give it a rigidity that will make retreat or compromise impossible. We shall be exchanging a process of trial and error at the hands of judges who make it the business of their lives for a process of trial and error at the hands of a legislative committee who will give it such spare moments as they can find amid multifarious demands."

---

[9] "And he said, Woe unto you also, ye lawyers! for ye lade men with burdens grievous to be borne, and ye yourselves touch not the burdens with one of your fingers."

"Woe unto you lawyers! for ye have taken away the key of knowledge: ye entered not in yourselves, and them that were entering in ye hindered." Luke 11:46, 52.

A final word under this heading: We are *not* considering today—as the opinions of both Brothers suggest—"the doctrine of governmental immunity." That doctrine includes within its purview the State and "its departments, commissions, boards, institutions, arms or agencies." See the court of claims act, CL 1948, §§ 691.101 through 691.123 (Stat Ann 1959 Cum Supp §§ 27.3548[1] through 27.3548[23]). We *are* considering the common-law rule that *municipal corporations* are immune from tort liability. "Municipal corporations" are distinctively definable (see *Hall* v. *Ira Township,* 348 Mich 402, and *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159), and care should be taken that today's decision is confined thereto. No lawyer should be left to wonder whether other public bodies are included within the scope of what we do in this case of Williams.

SECOND: THE OPINION PROPOSED BY
MR. JUSTICE EDWARDS

Another wary look at this opinion, and then another at the triparted opinions of *Browning,*[10] bring to doubly-cautioned mind Brutus' melancholy answer when first suasions of joinder were pressed upon him by another temporal "friend":

"Into what dangers would you lead me, Cassius,
That you would have me seek into myself
For that which is not in me?"[11]

Yes, with more resolution than Brutus ultimately displayed, I say it is not in me to join any straddle of a decision to overrule prospectively or retrospectively. If we are to overrule, let us do it outright either way, manfully according to the tried rules of judicial process. That is the only way to avoid

10 *Browning* v. *Paddock,* 364 Mich 293.
11 Shakespeare, Julius Caesar, act 1, sc 2.—REPORTER.

what *Browning* and *Molitor*[12] already have proven; that an appellate court, having determined to reward one litigant only of a distinct and inseparable class of litigants, naively asks for and gets into no end of trouble.

The supreme court did not, in cited *Sunburst*, affirm what Justice EDWARDS (miscalling it "the *Sunburst* doctrine") proposes for this case of Williams, that is, an overruling decision *effective for the case at bar* plus causes arising in the future. What was affirmed, in *Sunburst*, was a wholly prospective decision of the supreme court of Montana (*Montana Horse Products Co.* v. *Great Northern R. Co.*, 91 Mont 194 [7 P2d 919]; *Sunburst Oil & Refining Co.* v. *Great Northern R. Co.*, 91 Mont 216 [7 P2d 927]; rehearing 91 Mont 221 [7 P2d 927, 929]), *with the parties before the Court held firmly bound to the earlier rule.* As avowed earlier in this opinion, I would on pinpointed authority of the *Sunburst Case* do the same here. See, in this connection, Mr. Justice Roberts' concluding remarks in *Mahnich* v. *Southern S. S. Co.*, 321 US 96, 113 (64 S Ct 455, 88 L ed 561).

Mr. Justice Davis, dissenting in the *Molitor Case* (18 Ill2d 11 [163 NE2d 89]), was right when he said of his court's determination to decide bestride (p 41):

"The principle announced by the court is an aborted offspring of the *Sunburst* theory. It is without legal justification other than that the plaintiff should be rewarded for bringing the action, and it has thwarted the reasonable expectations of the well-intentioned governing body of defendant school district."

---

[12] *Molitor* v. *Kaneland Community Unit District No. 302,* 18 Ill2d 11 (163 NE2d 89).

In early 1949, with the handing down of equally-divided *Watson* v. *Bay City School District,* 324 Mich 1, a warning was given which resulted generally in a sort of compulsive reliance on the rule of municipal immunity tested in this and simultaneously considered companion cases.[13] Veteran municipal and school district counsel will recall as of that year the yet unanswered question whether, without specific legislative authority, legislatively chartered municipalities and school districts might lawfully spend public funds for acquisition and maintenance of general liability insurance. A few—but a few—courageous counsel, unwilling to wait upon legislative action as day to day and month to month risk continued, wisely advised their clients to disregard possible torpedoes in favor of buying liability insurance first and resisting onslaughts afterward. All others, not quite so bold, felt compelled to advise that precarious trust must be placed in *stare decisis;* simply for want of a legally dependable alternative. Now let us see how this judicially noticeable fact of reliance, on the rule of immunity, has worked its way to a wholly prospective decision in this case of Williams.

To this very date the legislature has failed to authorize the purchase and maintenance of general liability insurance by municipalities and school districts, and the question has not been settled in any other way. In the September, 1960 (vol 6, No 7), issue of the Michigan School Board Journal (published by the Michigan School Board Association, Midland, Michigan), we find under the heading "Can the King Do Wrong?" (pp 8, 9), open advocacy of purchase by school districts of comprehensive liability insurance, and asserted legal justification for

---

13 *Wardlow* v. *City of Detroit,* 364 Mich 291; *Sayers* v. *School District,* 366 Mich 217.

such action. We find in the same publication, a month later (Michigan School Board Journal, vol 6, No 8, pp 15, 21), these understandable observations of the attorney general:

"Parenthetically, it is noted that various local school districts face the possibility of being held liable for injuries resulting from accidents in connection with activities, such as athletic events to which an admission fee is charged. Various prob-. lems have been encountered in connection with the obtaining of insurance against such risk. These include:

"a. Lack of express statutory authority for educational institutions—either State or local—to expend funds for the payment of insurance premiums upon policies furnishing public liability coverage.

"b. The refusal upon the part of many insurance companies to issue policies limited only to those facilities of an institution which are involved in the performance of a proprietary function as distinguished from the entire institution.

"c. The issue as to whether it is advisable in the case of State facilities to effect such coverage upon all facilities, or whether a program should be inaugurated providing for self insurance.

"With these problems in mind, it is my thought that this matter deserves serious consideration at any early date by the legislature."

In spite of this and many earlier appeals for legislative action the legislature has left the matter in grave legal doubt, and so with the interim rise of pleaded causes of action against municipal corporations this Court is confronted with a duty to act and yet act with due regard for the rule that those who rely upon existing law may do so until they are advised to the contrary by one or both of the lawmaking branches of government.

The fact is that the municipal corporations of Michigan generally have been *forced* to rely on the

presently considered rule of immunity. Few locally
elected municipal officers care to vote disbursement
of liability insurance premiums when the legislature
has left the open question to which Attorney Gen-
eral Adams addressed himself above, and there is
no claim that the defendant city of Detroit is pro-
tected by public liability insurance (see, in such
connection, *Christie* v. *Board of Regents of Univer-
sity of Michigan*, 364 Mich 202.[14] This means, to me,
that our decision to overrule in all of today's com-
panion cases should be announced as prospective *in
its entirety.*

Fortunately, in this vanguard case, the blow of
affirmance will not destroy the statutory remedy
which has accrued to the dependents of plaintiff's
decedent. If the allegations of this Williams declara-
tion are true, and we must presently assume that
they are, an appropriate and not exactly niggard
award under the workmen's compensation act has
been made or is due to be made in their favor.

What is the proper course here, 5 members of the
Court having determined to override this common-
law rule of immunity? The *Sunburst Case* answers
directly. So, on another occasion that same year
(1932), did the great author of the supreme court's
unanimous *Sunburst* opinion:

"For such cases and others where a retroactive
declaration is for any reason inexpedient, I find my-
self driven more and more to the belief that courts
should be competent to follow the practice proposed
by Mr. Wigmore in his suggestive little book 'The
Problems of Law' and since espoused by others;
*they should apply the outworn rule to the case that
is then at hand,* and couple their judgment with the

---

[14] To say nothing of other differences, this case of Williams is
thus unlike *Parker* v. *Port Huron Hospital*, 361 Mich 1. There it
was definitely shown that the defendant hospital was insurance pro-
tected.

declaration that they will feel free to apply another rule to transactions consummated in the future."

"The objection will be made that courts are without power to tie the hands of their successors by a declaration of purpose not wrought into a judgment. If I conceive the situation justly, they are not attempting to tie the hands of anyone. They are untying and releasing. A fair paraphrase of what they say is this: 'The rule that we are asked to apply is out of tune with the life about us. It has been made discordant by the forces that generate a living law. We apply it to this case because the repeal might work hardship to those who have trusted to its existence. We give notice, however, that anyone trusting to it hereafter will do so at his peril.' "[15]

The only defense offered in the books, for decisions of overrulement effective for the case at hand plus future causes of action, is that otherwise there will be no incentive for appeals which, even though successful in overturning an outmoded rule, will result in no benefit to the appellant. See, for exposition of such defense, *Molitor* v. *Kaneland Community Unit District No. 302,* 18 Ill2d 11 (163 NE2d 89, 97).

With the dictum and its supporters I disagree. It discloses some little unfamiliarity with the resourcefulness of skilled lawyers and with what really goes on in the offices of modern law partnerships. Gauging risk against chance with care, deft counsel are always willing in selected cases to take appeals in the hope of changing generally if prospectively some rule which should be changed in the interest of justice and necessary growth of the law. Such counsel

[15] These quotations are taken from Justice Cardozo's address of January 22, 1932, before the New York State Bar Association. See Vol 55, report of New York State Bar Association, 262, 295–297. According to the introduction of Justice Cardozo (p 263) it was apparent that he was already in line for nomination to the supreme court.

.usually find that one intentionally risked loaf, when cast with timed care upon picked legal waters, is likely to bring multiple and worthy results even though the appellant—expendable or not expendable —is set down without day.

### CONCLUSION

All distinguished writers recommend corrective legislation, enacted with the adjusted detail carefully drawn statutes only can provide. So do I. But what is an appellate court to do when the legislative process remains comatose, year after year and decade after decade, the court meanwhile bearing the onus of what was done judicially during the dim yesterdays and maintained to this day by the self-stultifying fetish of *stare decisis?* Must the court continue to proclaim its impotence as legislators shrug their responsibility with a nod of *risus sardonicus* toward the error-guilty judicial branch? My answer is that this Court may relieve itself of past error by confessing and adjudging that error, and that it may at the same time force what all students of the problem have rightly sought for lo these many years; a statute relieving the injured citizen from the total burden of municipal negligence and still controlling the result so that municipal functions may be carried on without serious financial risk.

Dean Smith wrote the general temper of these sentiments shortly after *Watson* v. *Bay City School District, supra,* entered our advance sheets. His subject was "Municipal Tort Liability", 48 Mich L Rev 41. I accept and approve his "Conclusion" (p 56):

"With the ever-increasing scope of municipal government activities, the possibilities of harm to the individual are correspondingly greater. The present legal doctrines which purport to define the area within which the municipality shall make recompense to the individual harmed are inadequate in at least 2 respects. First, they fail to achieve even an

approximate degree of consistency in application because the distinction between governmental and proprietary functions is not founded upon any inherent quality of the various activities, but rather is generally used as a means of expressing a conclusion that immunity or liability should result in a particular situation. Second, the doctrines, as applied, do not correspond to current ideas of justice because they require the individuals who are harmed to bear a disproportionate part of the cost of enterprises undertaken for the benefit of the entire community. Adequate reformation can be achieved only by legislation. Legislation, like an efficient incinerator, can destroy completely the effect of the decisions which now perpetuate the doctrine of immunity. It must be legislation which will shift the basic approach to the problem; instead of having a general governmental immunity with certain exceptions, a general governmental responsibility with limited exceptions is needed. Those exceptions are to be determined not by reference to an outmoded dogma that 'The king can do no wrong,' but by reference to social interests which will be served by granting immunity."

About the same time Professor Lloyd, of the Syracuse University College of Law, wrote the following in like tenor (23 NYU Law Quar Rev 278, 292, 293):

"To correct an indefensible situation is highly desirable. To correct one by the creation of another is equally undesirable. The ancient adjuration against leaping from the frying pan to the fire is trite, but full of wisdom. In our insistence upon correcting injustice done the individual by placing emphasis solely upon one proposition, ought we to swing the whole way to place emphasis solely upon the other? Have our courts, municipalities and legislature prostituted the rights of innocent individuals all these years to a wholly unfounded fear of disaster to the financial structure of municipal corporations? Can we now safely impose unquali-

fied, unlimited financial responsibility upon our gov-
ernmental units without regard to type, or size, or
financial ability? And, even if we can, ought we make
the responsibility wholly theirs irrespective of the
function performed—when we know that certain of
their functions are fundamentally the obligation of
the State which, historically, came to be performed
by the municipal corporations on behalf of the State
primarily for purposes of convenient administra-
tion? If we are to impose such liability, ought we
leave the conflict of interest between the public and
the individual to be resolved by the ordinary tech-
niques of litigation without exploring the possibility
of developing quicker, surer, less expensive methods
of administration? Is it inevitable that we must
choose one horn of the dilemma or the other in our
effort to reconcile private and public rights in this
area? Or is some compromise desirable, and avail-
able, whereby we may do justice to one and at the
same time forestall disaster to the other?"

I return, then, to the original thrust of this review
of reviews: How should the Court go about elimina-
tion of its error of yesteryear? To do nothing is
unthinkable. To reward one plaintiff and deny like
rights to others of that plaintiff's class is equally
abhorrent to judges who stand for equal justice un-
der law. There is one way only of right, and that
is to pursue what was done in *Montana* and affirmed
in *Sunburst*.

*Molitor's* exclusive award to one plaintiff, as all
students of ensuing Illinois decisions realize now,[16]
has come to labyrinthian ends. For a review of the
situation see volume 37, No 1, Chicago-Kent Law
Review (April, 1960), p 44. The title is "Tom Moli-
tor and the Divine Right of Kings."[17] On page 51

---

[16] Those interested should Shepardize *Molitor,* reading with care
the subsequent Illinois decisions which are linchpinned to that case.

[17] We are indebted to counsel *amicus,* appearing in *Browning,* for
this reference. I do not care to join provocation of another like
critique, the title of which well might be "Charlotte Williams and
the Divine Right of Judicial Favoritism."

of this rather scathing commentary the author sums up his thoughts this way:

"If a legislature were to enact a law providing that whenever 18 children are injured in the burning of a school bus 1 shall have a cause of action to recover damages and 17 shall not, cries of outrage would ring through the land. It is doubtful that it would be possible to find a single court which would hesitate, even for one moment, before declaring such an enactment unconstitutional and void. Yet the supreme court of Illinois asserts the right to grant, as a matter of reward, that which a legislature could not."

Regrettably, release of these opinions cannot be delayed until the legislature is in session. The case before us has been submitted twice and should be decided now, before any possible change of our personnel takes place. In the latter event still another submission doubtless would be required.

The State-wide impact hereof need not, however, be too serious. The governor may call a special legislative session to authorize purchase and maintenance by municipal corporations of liability insurance pending the regular session and such contemplative study of the situation as may result in legislative determination to effect strict immunity by statute; modified immunity by statute; amount-limited liability by statute, or full liability by statute with insured protection.

I vote to affirm, without costs and with accompanying declaration that like causes of action arising hereafter will, unless and until the legislature rises and ordains otherwise, be treated in the courts of Michigan as typical negligence cases.

SUPPLEMENT (September 5, 1961):

Since the above was written Mr. Justice EDWARDS has recast what are now the final 14 paragraphs of his opinion. Some brief comment is in order.

My Brother, reviewing the above considered question of discrimination (among litigants holding correspondingly alleged rights of action), refers to rejection of Ronald Molitor's case (*Molitor* v. *Kaneland Community Unit District No. 312,* 18 Ill2d 11 [163 NE2d 89]) and says:

"Although not conclusive of the legal issue it is interesting to note that certiorari was denied." (Citing 362 US 968 [80 S Ct 955, 4 L ed2d 900].)

I find nothing here that is worthy of note or suggestive of interest. Thirty-eight years ago Mr. Justice Holmes, writing for the unanimous Court in *United States* v. *Carver,* 260 US 482 (43 S Ct 181, 67 L ed 361), repeated again what all veteran practitioners in the Federal courts know and have known from away back; "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times" (p 490). We have brought this rule into our own backyard, expressly and tersely (*Malooly* v. *York Heating & Ventilating Corp.,* 270 Mich 240, 247; *Great Lakes Realty Corp.* v. *Peters,* 336 Mich 325, 328, 329), and it has not as yet come to pass that denial of an application for certiorari or appeal amounts to another kind of *stare decisis,* "conclusive" or otherwise.

The fact is that certiorari denied—or application for leave to appeal denied—is an absolute prerogative of negation every court of last resort must possess on peril of such deluge of appealed cases as would make of all the hoary likes of Jarndyce, where the "little plaintiff or defendant, who was promised a new rocking-horse when Jarndyce and Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into the other world."[*]

---

[*] Dickens, Bleak House, ch 1.—REPORTER.

My Brother quotes from *Sunburst* (starting on page 364 of the report) and concludes therefrom that the supreme court has approved or authorized what he proposes, that is, application of the new rule in favor of the plaintiff at bar with all other possessors of like causes left out. I do not read *Sunburst* that way and content myself with pointed requotation of the key sentences thereof (pp 364, 365 of report):

"A State in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law nonetheless for intermediate transactions. Indeed there are cases intimating, too broadly (*cf. Tidal Oil Co. v. Flanagan,* 263 US 444 [44 S Ct 197, 68 L ed 382]), that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. [Citing cases.] On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning."

It will be noted that this language provides no middle ground; no authority for a Solomonic decision as proposed here. Mr. Justice Cardozo, writer of the opinion, made this clear—the same year—in his address to the New York State Bar Association (quoted above). I do not doubt that he foresaw, then, what would happen should a court of final appeal determine to overrule beneficially in favor of but one of a class. Witness Tom Molitor and the bitter progeny of that case.

There is another eminent reason for refusal to overrule in behalf of one to exclusion of others standing—in line and as a class—before us. Aside from the implications—if any—denial of certiorari in *Molitor* brings to us, we come to our separate obligation, enjoined upon us by the first section of article 2 of the Constitution of 1908. That section, co-extensively with the national equality clause, assures within our State that "The equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution." (*In re Fox's Estate,* 154 Mich 5; *Naudzius* v. *Lahr,* 253 Mich 216, 222 [74 ALR 1189, 30 NCCA 179]; *Cook Coffee Co.* v. *Village of Flushing,* 267 Mich 131.)

Thus, even if there were no supreme Fourteenth Amendment, I would—upon oath to support my State's Constitution as well as the national Constitution—stand against any repetition in Michigan of that which Illinois has experienced on account of *Molitor's* unfortunate determination—by majority opinion—to grant relief in favor of Tom Molitor to exclusion of the additional children who were riding with him in the school bus when he was injured.

Mr. Williams' death occurred in December of 1954. Doubtless, considering the allegations of this declaration, the intervening years have seen the continued payment to Mr. Williams' dependents of many thousands of dollars of benefits under the workmen's compensation law. There is no reason in fact, and no reason in law why we should give them something this Court must deny to others—not so fortunately situated—of their identical class (the dependents of Mr. Wardlow for instance; *Wardlow* v. *City of Detroit,* 364 Mich 291).