Ayala et al., Appellants, *v.* Philadelphia Board of Public Education.

Argued March 12, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused June 25, 1973.

586

*Stephen M. Feldman*, with him *Joseph G. Feldman, John M. Demcisak,* and *Feldman & Feldman,* for appellants.

*Robert T. Lear,* Assistant Counsel, with him *Edward B. Soken,* General Counsel, for Philadelphia Board of Public Education, appellee.

OPINION BY MR. JUSTICE ROBERTS, May 23, 1973:

Appellants, William Ayala and William Ayala, Jr., instituted this action to recover damages for injuries suffered by William, Jr., when his arm was caught in a shredding machine in the upholstery class of the Carrol School in Philadelphia. As a result of these injuries, the 15 year old student's arm was amputated.

Appellants alleged that appellee school district, through its employees, was negligent in failing to supervise the upholstery class, in supplying the machine for use without a proper safety device, in maintaining the machine in a dangerous and defective condition, and in failing to warn the children of the dangerous condition. Appellee, the Philadelphia Board of Public Education, interposed preliminary objections asserting the defense of governmental immunity. These objections were sustained and the Superior Court affirmed in a per curiam order. *Ayala v. Philadelphia Board of Public Education,* 223 Pa. Superior Ct. 171, 297 A. 2d 495 (1972).[1] We granted allocatur.

---

[1] Judge HOFFMAN filed a concurring opinion, in which Judge SPAULDING joined. *Ayala v. Philadelphia Board of Public Educa-*

We now hold that the doctrine of governmental immunity[2]—long since devoid of any valid justification—is abolished in this Commonwealth.[3] In so doing, we join the ever-increasing number of jurisdictions which have judicially abandoned this antiquated doctrine. See, e.g., *Spencer v. General Hospital of District of Columbia*, 425 F. 2d 479 (D.C. Cir. 1969) ; *Campbell v. State*, 284 N.E. 2d 733 (Ind. 1972) (citing with approval *Klepinger v. Board of Commissioners*, 143 Ind. App. 155, 239 N.E. 2d 160 (1968) and *Brinkman v. City of Indianapolis*, 141 Ind. App. 662, 231 N.E. 2d 169 (1967) ; *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P. 2d 968 (1971) ; *Flournoy v. School District No. 1*, 174 Colo. 110, 482 P. 2d 966 (1971) ; *Smith v. State*, 93 Idaho 795, 473 P. 2d 937 (1970) ; *Willis v. Department of Conservation and Econ. Dev.*, 55 N.J. 534, 264 A. 2d 34 (1970) ; *Becker v. Beaudoin*, 261 A. 2d 896 (R.I. 1970) ; *Johnson v. Municipal University of Omaha*, 184 Neb. 512, 169 N.W. 2d 286 (1969) ; *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W. 2d 805 (1968) ; *Parish v. Pitts*, 244 Ark. 1239, 429 S.W. 2d 45 (1968) ; *Veach v. City of Phoenix*, 102 Ariz. 195, 427 P. 2d 335

tion, 223 Pa. Superior Ct. 171, 172, 297 A. 2d 495, 496 (1972). Judge PACKEL also filed a concurring opinion. Id. at 175, 297 A. 2d at 497. These opinions expressed discontent with the governmental immunity doctrine but stated that "it is for the highest court of the Commonwealth to act to abrogate the inequities of the doctrine of sovereign immunity." Id. (HOFFMAN, J., concurring).

[2] We are not, here, confronted with the sovereign immunity of the Commonwealth.

[3] Prior decisions to the contrary are overruled. See, e.g., *Smeltz v. Harrisburg*, 440 Pa. 224, 269 A. 2d 466 (1970) ; *Dillon v. York City School District*, 422 Pa. 103, 220 A. 2d 896 (1966) ; *Shields v. Pittsburgh School District*, 408 Pa. 388, 184 A. 2d 240 (1962) ; *Morris v. Mount Lebanon Township School District*, 393 Pa. 633, 144 A. 2d 737 (1958) ; *Boorse v. Springfield Township*, 377 Pa. 109, 103 A. 2d 708 (1954) ; *Carlo v. Scranton School District*, 319 Pa. 417, 179 Atl. 561 (1935) ; *Ford v. School District*, 121 Pa. 543, 15 Atl. 812 (1888).

(1967) (relying on *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P. 2d 107 (1963)) ; *Haney v. City of Lexington*, 386 S.W. 2d 738 (Ky. 1964) ; *Sherbutte v. Marine City*, 374 Mich. 48, 130 N.W. 2d 920 (1964) ; *Rice v. Clark County*, 79 Nev. 253, 382 P. 2d 605 (1963) ; *Scheele v. City of Anchorage*, 385 P. 2d 582 (Alaska 1963) ; *City of Fairbanks v. Schaible*, 375 P. 2d 201 (Alaska 1962) ; *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W. 2d 795 (1962) ; *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W. 2d 618 (1962) ; *Muskopf v. Corning Hospital District*, 55 Cal. 2d 211, 359 P. 2d 457, 11 Cal. Rptr. 89 (1961) ; *Williams v. City of Detroit*, 364 Mich. 231, 111 N.W. 2d 1 (1961) ; *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E. 2d 89 (1959) ; *Hargrove v. Town of Cocoa Beach*, 96 So. 2d 130 (Fla. 1957).[4]

## I.

It is generally agreed that the historical roots of the governmental immunity doctrine are found in the English case of *Russell v. Men of Devon*, 2 T.R. 667, 100 Eng. Rep. 359 (1788). See, e.g., *Parish v. Pitts*, supra; *Molitor v. Kaneland Community Unit District No. 302*, supra; Prosser, Handbook on the Law of Torts 1004 (3d ed. 1964); Stason, Governmental Tort Liability Symposium, 29 N.Y.U.L. Rev. 1321 (1954); Borchard, Government Liability in Tort, 34 Yale L.J. 1 (1924). There, the court, in extending immunity to an unincorporated county, expressed the fear that if suits against such political subdivisions were permitted, there would be "an infinity of actions." *Russell v. Men of Devon*, supra at 672, 100 Eng. Rep. at 362. That

---

[4] See Appendix for a compilation of the present position of each state with regard to the doctrine of governmental immunity.

court was also influenced by the absence of a fund "out of which satisfaction is to be made." Id. Finally, Justice Ashurst, expressing the eighteenth century societal evaluation of the individual and local governmental interests, observed that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." Id.

While some attribute the immunity of municipal corporations and quasi-corporations to an extension of the theory that "the King can do no wrong", it has been noted that in *Russell v. Men of Devon* there is no mention of that phrase. *Spanel v. Mounds View School District No. 621,* supra at 282, 118 N.W. 2d at 797. Rather, "[e]very reason assigned by the court [in *Russell*] is born of expediency. The wrong to plaintiff is submerged in the convenience of the public. No moral, ethical, or rational reason for the decision is advanced by the court except the practical problem of assessing damages against individual defendants." Id.[5]

Additionally, it has been suggested that the doctrine of governmental immunity was a result of the English courts' difficulties with the principle of respondeat superior.

"The attribution of an officer's torts to the state was not obvious on general principle. If the judges found it difficult to attribute to a private principal the tort of an agent chosen by him to work within rather limited confines, how much more difficult to attribute to that undefinable entity, the state, the illegal acts of

---

[5] Extension of the theory that the "King can do no wrong" to political subdivisions is especially suspect in light of Professor Jaffe's observation that, historically, the "major effect of the doctrine of sovereign immunity was procedural. Claims in form 'against the Crown' were to be pursued by petition of right." Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 18 (1963). See also Borchard, Government Liability in Tort, 34 Yale L. J. 1 (1924).

its various officers performing as a body a most disparate collection of functions.

"In short, the source of the 'mystery' lay not solely in the doctrine of sovereign immunity. *Respondeat superior* had caused difficulties as early as the nineteenth century in England, when the question arose whether the King, who by that time could be sued in contract whenever 'right should be done,' should be held for his officers' torts. The courts denied such relief, reasoning that *respondeat superior* was based on the identity of principal and agent, because the King could not himself commit a tort, the attribution failed for want of a competent principal." Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 210 (1963) (footnote omitted).

Whatever may have been the actual basis for *Russell v. Men of Devon,* the doctrine it advanced was soon applied in the United States. In *Mower v. Leicester,* 9 Mass. 247 (1812), the Massachusetts court, relying upon *Russell,* held that an incorporated county was immune from liability for the tortious conduct of its employees. As to the adoption of this doctrine, it has been observed: ". . . the only similarity between the situation in New England and the Russell case lay in the fact that the defendants were counties. The New England county was incorporated, had a corporate fund and the means of enlarging it by taxation and was charged by statute with the duty of keeping highways in repair. Under the authority of Russell v. Devon, therefore, practically no reason for immunity can be found in these circumstances to exist, yet the Massachusetts court passed judgment for the defendant on the unconvincing ground that the county was a *quasi*corporation created by the legislature for purposes of public policy and not voluntarily, like a city, and that as a State agency it was therefore immune. This poor-

ly reasoned decision, based upon a case which contradicts rather than sustains it, has been followed very generally in New England and has become the 'common law' of the states of the United States, with few exceptions." Borchard, supra at 42 (footnote omitted). "On such slender grounds have rested thousands of decisions requiring the assumption by the injured parties of damages inflicted by public corporations." Stason, supra at 1321.

Pennsylvania joined the numerous states adopting the immunity doctrine and, in *Ford v. School District,* 121 Pa. 543, 15 Atl. 812 (1888), held that school districts, as quasi-corporations, are not liable for the tortious conduct of employees. The Court's decision was motivated by factors similar to those which influenced the English court in *Russell.* Initially, the Court noted that school districts are agents of the Commonwealth "and are made quasi-corporations for the sole purpose of the administration of the commonwealth's system of public education." Id. at 547, 15 Atl. at 815. More importantly, the Court was reluctant to impose liability because "the act of assembly provides no fund out of which the directors can pay damages resulting from their own misconduct or that of their officers." Id. The Court further stated that "individual advantage must give way to the public welfare." Id. at 549, 15 Atl. at 815-16.

Although the English courts abandoned the doctrine and permitted suits against municipalities and school districts,[6] this Commonwealth continued to deny recovery. See, e.g., *Kesman v. Fallowfield Township School District,* 345 Pa. 457, 29 A. 2d 17 (1942) ; *Devlin v. Philadelphia School District,* 337 Pa. 209, 10 A. 2d 408 (1940) ; *Carlo v. Scranton School District,* 319

---

[6] See cases cited in *Williams v. City of Detroit,* 364 Mich. 231, 258, 111 N.W. 2d 1, 24 (1961) (EDWARDS, J.)

Pa. 417, 179 Atl. 561 (1935). In *Morris v. Mount Lebanon Township School District*, 393 Pa. 633, 636, 144 A. 2d 737, 738 (1958), the Court refused to completely abrogate the immunity doctrine, but held that school districts, like municipal corporations, "are not immune from liability in tort for the negligent acts of their servants committed in the course of the [school district's] proprietary functions." See also *Flinchbaugh v. Cornwall-Lebanon School Authority*, 438 Pa. 407, 264 A. 2d 708 (1970); *Dillon v. York City School District*, 422 Pa. 103, 220 A. 2d 896 (1966); *Shields v. Pittsburgh School District*, 408 Pa. 388, 184 A. 2d 240 (1962); *Supler v. N. Franklin Township School District*, 407 Pa. 657, 182 A. 2d 535 (1962).

Thus, until the present action, we have retained the archaic and artificial distinction between tortious conduct arising out of the exercise of a proprietary function and tortious conduct arising out of exercise of a governmental function.

## II.

Today we conclude that no reasons whatsoever exist for continuing to adhere to the doctrine of governmental immunity. Whatever may have been the basis for the inception of the doctrine, it is clear that no public policy considerations presently justify its retention.

Governmental immunity can no longer be justified on "an amorphous mass of cumbrous language about sovereignty. . . ." Leflar and Kantrowitz, Tort Liability of the States, 29 N.Y.U.L. Rev. 1363, 1364 (1954). As one court has stated: " '. . . it is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can

do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' Barker v. City of Santa Fe, 47 N.M. 85, 136 P. 2d 480, 482. Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that 'divine right of kings' on which the theory is based." *Molitor v. Kaneland Community Unit District No. 302*, supra at 21-22, 163 N.E. 2d at 94. See also *Evans v. Board of County Commissioners*, supra; *Hargrove v. Town of Cocoa Beach*, supra.

Moreover, we are unwilling to perpetuate the notion that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." *Russell v. Men of Devon*, supra at 673, 100 Eng. Rep. at 362. This social philosophy of nonliability is "an anachronism in the law of today." *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 502, 208 A. 2d 193, 201 (1965). As has been noted: "The social climate which fostered the growth of absolutism and the divine right of kings in England has long since been tempered with the warm winds of humanitarianism and individual freedom. The changes which have occurred in the last century with respect to the imposition of liability upon private corporate enterprises of any kind are well known. Workmen's compensation laws have replaced the old theories which permitted the corporate organizations to escape liability under the fellow-servant rule or the doctrine of assumption of risk. Li-

ability may now be predicated without fault merely on grounds that potential injuries to individuals must be calculated as a part of the cost of doing business, and must be paid for by the business enterprise. *There is widespread acceptance of a philosophy that those who enjoy the fruits of the enterprise must also accept its risks and attendant responsibilities.*" Smith, Municipal Tort Liability, 48 Mich. L. Rev. 41, 48 (1949) (emphasis added) (footnote omitted).

Recently, this Court reiterated the prevailing philosophy that liability follows tortious conduct. In *Niederman v. Brodsky,* 436 Pa. 401, 403, 261 A. 2d 84, 85 (1970), we said: " 'It is fundamental to our common law system that one may seek redress for every substantial wrong. "The best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequences of his misconduct. . . ." ' Battalla v. State, 10 N.Y. 2d 237, 240, 219 N.Y.S. 2d 34, 36, 176 N.E. 2d 729, 730 (1961)." See also *Stone v. Arizona Highway Commission,* supra at 392, 381 P. 2d at 112; *Muskopf v. Corning Hospital District,* supra at 220, 359 P. 2d at 462, 11 Cal. Rptr. at 94.

Appellee offers no reason—and we are unable to discern one—for permitting governmental units to escape the effect of this fundamental principle.

"As we have stated many times before, today cities and states are active and virile creatures capable of inflicting great harm, and their civil liability should be co-extensive. Even though a governmental entity does not profit from its projects, the taxpaying public nevertheless does, and it is the taxpaying public which should pay for governmental maladministration. If the city operates or maintains injury-inducing activities or conditions, the harm thus caused should be viewed as a part of the normal and proper costs of public administration and not as a diversion of public funds. The

city is a far better loss-distributing agency than the innocent and injured victim. See 2 Harper and James, Torts, 622 (1956)." 32 American Trial Lawyers J. 284, 288 (1968).

We must also reject the fear of excessive litigation as a justification for the immunity doctrine. Empirically, there is little support for the concern that the courts will be flooded with litigation if the doctrine is abandoned. See, e.g., David, Tort Liability of Local Government: Alternatives to Immunity from Suit or Liability, 6 U.C.L.A. L. Rev. 1 (1959) ; Fuller and Casner, Municipal Tort Liability in Operation, 54 Harv. L. Rev. 437, 469 (1941). So, too, what this Court said in *Niederman v. Brodsky,* supra at 412, 261 A. 2d at 89, is applicable here: ". . . more compelling than an academic debate over the apparent or real increases in the amount of litigation, is the fundamental concept of our judicial system that any such increase should not be determinative or relevant to the availability of a judicial forum for the adjudication of impartial individual rights. 'It is the business of the law to remedy wrongs that deserve it, even at the expense of a "flood of litigation"; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do.' Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L. Rev. 874 (1939). We obviously do not accept the 'too much work to do' rationale. We place the responsibility exactly where it should be: not in denying relief to those who have been injured, *but on* the judicial machinery of the Commonwealth to fulfill its obligation to make itself available to litigants. Who is to say which class of aggrieved plaintiffs should be denied access to our courts because of speculation that the workload will be a burden? Certainly this Court is unwill-

ing to allow such considerations to influence a determination whether a class of litigants will be denied or permitted to seek adjudication of its claims." (Emphasis in original.)

Equally unpersuasive is the argument advanced in *Russell v. Men of Devon,* and *Ford v. School District* that immunity is required because governmental units lack funds from which claims could be paid. It is argued that funds would be diverted to the payment of claims and the performance of proper governmental functions would be obstructed. Initially, we note our disagreement with the assumption that the payment of claims is not a proper governmental function. "As many writers have pointed out, the fallacy in [the no-fund theory] is that it assumes the very point which is sought to be proved, i.e., that payment of damage claims is not a proper purpose." *Molitor v. Kaneland Community Unit District No. 302,* supra at 22, 163 N.E. 2d at 94.

Additionally, the empirical data does not support the fear that governmental functions would be curtailed as a result of liability for tortious conduct. One commentator has written: "Figures actually compiled showing the claims experience in typical cities show that the spectre of the crippling judgment, as a deterrent to abrogation of procedural or substantive immunities, so far as [sic] not materialized in any great degree. The force of the 'crippling judgment' may be vitiated by self-insurance or commercial insurance . . . . So far as known, municipal insolvency proceedings in the federal courts have not occurred because of tort judgments." David, supra at 53. See also *Parish v. Pitts,* supra at 1250-51, 429 S.W. 2d at 51; Note, Municipal Tort Liability in Pennsylvania—Checkered Immunity, 100 U. Pa. L. Rev. 92, 105 (1951). The availability of public insurance removes what was the under-

lying reason for *Men of Devon. Williams v. City of Detroit,* supra at 257-58, 111 N.W. 2d at 24 (EDWARDS, J.).

Finally, this Court addressed the financial burden argument in *Flagiello v. Pennsylvania Hospital,* supra. There, in rejecting the argument as it applied to the immunity of charitable institutions, we said: "The voluminous arguments advanced by the defendant hospital and the amicus curiae, on the subject of the financial problems of hospitals today, are, while interesting and enlightening, wholly irrelevant to the issue before us. We have a duty to perform and that is to see that justice, within the framework of law, is done. Our function is to decide cases as they come before us on the pertinent facts and law. What could happen in the event the plaintiff obtains a verdict is not an issue here. The pleadings in this litigation require that we decide whether the defendant hospital should answer the charges brought against it by the plaintiff." Id. at 503-04, 208 A. 2d at 202.[7]

Thus, we must agree with Chief Justice TRAYNOR of the California Supreme Court that "the rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." *Muskopf v. Corning Hospital District,* supra at 216, 359 P. 2d at 460, 11 Cal. Rptr. at 92. Moreover, the distinction between governmental and proprietary functions "is probably one of the most unsatisfactory known to the law, for it has caused confusion not only among the various jurisdictions but almost always within each jurisdiction." Davis, Administrative Law Treatise §25.07 at 460 (1958).

---

[7] It is interesting to note that the Court in *Ford v. School District,* supra note 3, in concluding that school districts are immune, analogized to the immunity of charities. However, in *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A. 2d 193 (1965), we abolished the doctrine of charitable immunity.

This Court recognized the general dissatisfaction with this distinction when we stated, "Perhaps there is no issue known to the law which is surrounded by more confusion than the question whether a given municipal operation is governmental or proprietary in nature." *Morris v. Mount Lebanon Township School District*, supra at 637, 144 A. 2d at 739. Compare *Shields v. Pittsburgh*, supra (operation of playground during vacation is a governmental function) with *Morris v. Mount Lebanon Township School District*, supra, decided four years earlier (operation of summer recreation program is a proprietary function).

Recently, the Indiana Supreme Court echoed the widespread displeasure with the governmental- proprietary distinction: "Exactly what constitutes a proprietary function as opposed to a governmental function has never been clearly enunciated by the courts, and this failure to establish a criteria has led to the generally confused state of the bench and bar in the application of the doctrine of sovereign immunity. Deciding on useful guidelines between rather obscure, whimsical notions enunciated by the appellate courts throughout the country has caused enormous conflicts in the courts in the past decade." *Campbell v. State*, supra at 735.

In now rejecting the immunity doctrine and the "legalistic distinctions that have only remote relationship to the fundamental considerations of muncipal tort responsibility" (Fuller and Casner, supra at 443), we recognize, as did Dean Prosser, that: "Virtually all writers have agreed that no one of these reasons for denying liability is sound, and all of them can be found to have been rejected at one time or another in the decided cases. The current of criticism has been that it is better that the losses due to tortious conduct should fall upon the municipality rather than the injured in-

dividual, and that the torts of public employees are properly to be regarded, as in other cases of vicarious liability, as a cost of the administration of government, which should be distributed by taxes to the public." Prosser, supra at 1004-05 (footnotes omitted).

Imposition of tort liability will, thus, be more responsive to current concepts of justice. Claims will be treated as a cost of administration and losses will be spread among all those benefited by governmental action. See, e.g., *Stone v. Arizona Highway Commission*, supra; *Muskopf v. Corning Hospital District*, supra; *Smith*, supra at 56.

Moreover, "where governmental immunity has had the effect of encouraging laxness and a disregard of potential harm, exposure of the government to liability for its torts will have the effect of increasing governmental care and concern for the welfare of those who might be injured by its actions." Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn. L. Rev. 1047, 1057 (1968). As Dean Prosser has written: "The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive." Prosser, Handbook on the Law of Torts 23 (3d ed. 1964).

### III.

Appellee seems to recognize that significant public policy considerations demand abolition of the governmental immunity doctrine. Indeed, appellee does not

attempt to justify retention of immunity on policy grounds. Rather, it contends that abrogation, if it is to be achieved, should be accomplished by legislative direction rather than by judicial determination.

In response to arguments that the Court should defer to legislative action, we stated in *Flagiello v. Pennsylvania Hospital,* supra at 503, 208 A. 2d at 202: "[T]he controverted rule [charitable immunity] is not the creation of the Legislature. *This Court fashioned it, and, what it put together, it can dismantle."* (Emphasis added.)

Again in *Falco v. Pados,* 444 Pa. 372, 382, 282 A. 2d 351, 356 (1971) (quoting *Badigian v. Badigian,* 9 N.Y. 2d 472, 481, 174 N.E. 2d 718, 724, 215 N.Y.S. 2d 35, 43 (1961)), we said: " '. . . it is urged, that, if there is a remedy it must be given by the Legislature, if there is to be a change, it may not be effected by the courts. This court has heard such arguments before and has answered them by saying that, where the rule is court made, it may be court modified if reason and a right sense of justice recommend it (citations omitted).' So too, in recent years this Court has had the fortitude and wisdom to effectuate changes in the law where 'reason and a right sense of justice' recommend it."

Similarly, here, the doctrine of governmental immunity—judicially imposed—may be judicially terminated. "Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity. 'We closed our courtroom doors without legislative help, and we can likewise open them.' " *Molitor v. Kaneland Community Unit District No. 302,* supra at 25, 163 N.E. 2d at 96. See also *Spencer v. General Hospital District of Columbia,* supra; *Campbell v. State,* supra; *Klepinger v. Board of Commissioners,* supra; *Brinkman v. City of Indianapolis,* supra; *Evans*

*v. Board of County Commissioners,* supra; *Flournoy v. School District No. 1,* supra; *Smith v. State,* supra; *Willis v. Department of Conservation and Econ. Dev.,* supra; *Becker v. Beaudoin,* supra; *Johnson v. Municipal University of Omaha,* supra; *Brown v. City of Omaha,* supra; *Parish v. Pitts,* supra; *Veach v. City of Phoenix,* supra; *Haney v. City of Lexington,* supra; *Sherbutte v. Marine City,* supra; *Rice v. Clark County,* supra; *Scheele v. City of Anchorage,* supra; *City of Fairbanks v. Schaible,* supra; *Spanel v. Mounds View School District No. 621,* supra; *Holytz v. City of Milwaukee,* supra; *Muskopf v. Corning Hospital District,* supra; *Williams v. City of Detroit,* supra; *Hargrove v. Town of Cocoa Beach,* supra.[8]

---

[8] The notion that the immunity of the school district is linked to the sovereign immunity of the Commonwealth and that, therefore, only the Legislature may act, is a notion without present vitality. Underlying this assumption is the theory that there is a distinction between municipal corporations and quasi-corporations, the latter being agents of the Commonwealth and, thus, entitled to the sovereign immunity enjoyed by the Commonwealth. See *Ford v. School District,* supra note 3.

We expressly rejected this theory in *Morris v. Mount Lebanon Township School District,* supra at 636, 144 A. 2d at 738 where this Court said: "Although early cases appear to have distinguished between municipal corporations proper, (cities and boroughs), and quasi-municipal corporations, (counties, townships and school districts), stating that the latter were subject to a *lesser liability,* these decisions meant no more than that as quasi-municipal corporations they exercised predominantly 'governmental' functions, *the area of their potential liability was more limited.*" (Footnotes omitted) (Emphasis in original.)

Thus, municipal corporations and quasi-corporations are on an equal level with regard to immunity. The immunity of both these types of governmental units was judicially created and may be judicially abolished. Whatever may be the need for legislative action in the area of sovereign immunity, it is clear that there is no requirement for legislative action to abolish—as we do here—the immunity of municipal corporations and quasi-corporations.

On prior occasions, we recognized that errors of "history, logic and policy" were responsible for the development of the governmental immunity doctrine. *Morris v. Mount Lebanon Township School District*, supra at 635, 144 A. 2d at 738. See also *Dillon v. York City School District*, supra. Nevertheless, we suggested that the Legislature should undertake the abrogation of governmental immunity. Id. These suggestions do not preclude our Court from now abolishing this judicially created doctrine. In so doing, we join numerous other jurisdictions which similarly, by judicial decision, have abandoned governmental immunity notwithstanding prior deference to legislative action. See, e.g., *Parish v. Pitts*, supra; *Haney v. City of Lexington*, supra; *Spanel v. Mounds View School District No. 621*, supra; *Holytz v. City of Milwaukee*, supra.

The Wisconsin Supreme Court, for example, prior to its decision in *Holytz v. City of Milwaukee*, supra, had expressed the view that any change in the governmental immunity doctrine must come from the Legislature. See *Britten v. Eau Claire*, 260 Wis. 382, 386, 51 N.W. 2d 30, 32 (1952). Yet, in *Holytz*, that Court concluded, as we do here: "We are satisfied that the governmental immunity doctrine has judicial origins. Upon careful consideration, we are now of the opinion that it is appropriate for this court to abolish this immunity notwithstanding the legislature's failure to adopt corrective enactments." Id. at 37, 115 N.W. 2d at 623.

It must be concluded, therefore, that: "A rule which in its origins was the creation of the courts themselves, and was supposed in the making to express the *mores* of the day, may be abrogated by the courts when the *mores* have so changed that perpetuation of the rule would do violence to the social conscience." Cardozo, The Growth of the Law 136-37 (1924).

Our decision is in complete harmony with this jurisprudential principle.

## IV.

Appellee urges that abrogation of the immunity doctrine disturbs the principle of *stare decisis*. It seems obvious, however, that appellee not only misconceives the mission of the *stare decisis* principle, but also ignores the admonition of Chief Justice CARDOZO: "We tend sometimes, in determining the growth of a principle or a precedent, to treat it as if it represented the outcome of a quest for certainty. That is to mistake its origin. Only in the rarest instances, if ever, was certainty either possible or expected. The principle or the precedent was the outcome of a quest for probabilities. Principles and precedents, thus generated, carry throughout their lives the birthmarks of their origin. They are in truth provisional hypotheses, born in doubt and travail, expressing the adjustment which commended itself at the moment between competing possibilities." Id. at 69-70 (footnote omitted).

The doctrine of governmental immunity, created centuries ago, is, like most other principles, "a provisional hypothesis." As stated in *Smith v. State,* supra at 801, 473 P. 2d at 943: "When precedent is examined in the light of modern reality and it is evident that the reason for the precedent no longer exists, the abandonment of the precedent is not a destruction of stare decisis but rather a fulfillment of its proper function.

"Stare decisis is not a confining phenomenon but rather a principle of law. And when the application of this principle will not result in justice, it is evident that the doctrine is not properly applicable."

This Court has repeatedly recognized that the principle of *stare decisis* is not a "confining phenomenon." We are mindful of the observation of Mr. Justice SCHAEFER of the Supreme Court of Illinois: "Precedent

speaks for the past; policy for the present and the future. The goal which we seek is a blend which takes into account in due proportion the wisdom of the past and the needs of the present." Schaefer, Precedent and Policy, 34 U. Chi. L. Rev. 3, 24 (1966).

In *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A. 2d 796 (1964), we abandoned the "place of wrong" choice-of-law rule. Over claims of *stare decisis,* we stated: "Although adherence to that principle is generally a wise course of judicial action, it does not rigidly command that we follow without deviation earlier pronouncements which are unsuited to modern experience and which no longer adequately serve the interests of justice. Surely, the orderly development of the law must be responsive to new conditions and to the persuasion of superior reasoning. '[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years.' Cardozo, The Nature of the Judicial Process 150-51 (1921)." Id. at 23, 203 A. 2d at 806.

Again, in *Olin Mathieson C. Corp. v. White C. Stores,* 414 Pa. 95, 100, 199 A. 2d 266, 268 (1964) (holding unconstitutional the Pennsylvania Fair Trade Act as applied to nonsigners of price maintenance contracts), we said: "While it is true that great consideration should always be accorded precedent, especially one of long standing and general acceptance, it doesn't necessarily follow that a rule merely established by precedent is infallible. Moreover, the courts should

not perpetrate error solely for the reason that a previous decision, although erroneous, has been rendered on a given question. This is particularly true where no fixed rights of property are involved or where great injustice or injury will result by following the previous erroneous decision. If it is wrong it should not be continued. Judicial honesty dictates corrective action."

In *Flagiello v. Pennsylvania Hospital,* supra, we abrogated the outmoded doctrine of charitable immunity. In response to claims of *stare decisis,* this Court said: "Stare decisis is not an iron mold into which every utterance by a Court, regardless of circumstances, parties, economic barometer and sociological climate, must be poured, and, where, like wet concrete, it must acquire an unyielding rigidity which nothing later can change.

"Chief Justice VON MOSCHZISKER of this Court said: '. . . if, after thorough examination and deep thought a prior judicial decision seems wrong in principle or manifestly out of accord with modern conditions of life, it should not be followed as a controlling precedent.' (VON MOSCHZISKER, Stare Decisis in Courts of Last Resort, 37 Harv. L. R. 409, at 414)." Id. at 511, 208 A. 2d at 205.

The cases are numerous in which this Court has rejected principles which were "out of accord with modern conditions of life." See, e.g., *Commonwealth v. McCusker,* 448 Pa. 382, 292 A. 2d 286 (1972) (rejected rule that psychiatric evidence is inadmissible in murder prosecution for purposes of determining whether defendant acted in heat of passion) ; *Commonwealth v. Archambault,* 448 Pa. 90, 290 A. 2d 72 (1972) (rejected prior cases concerning scope of permissible remarks by a judge to jury) ; *Falco v. Pados,* supra (abrogated parental immunity) ; *Conestoga National Bank v. Patterson,* 442 Pa. 289, 275 A. 2d 6 (1971) (reversed prior rule regarding procedure afforded protesting banks in

branch bank application situations); *Smalich v. West-fall*, 440 Pa. 409, 269 A. 2d 476 (1970) (rejected prior rule imputing contributory negligence of driver to owner-passenger); *Papieves v. Kelly*, 437 Pa. 373, 263 A. 2d 118 (1970) (recovery permitted for emotional distress resulting from intentional or wanton misconduct); *Niederman v. Brodsky*, supra (abolished impact rule); *Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A. 2d 395 (1968) (rejected prior limitation on a landlord's liability for defective conditions); *Kassab v. Central Soya*, 432 Pa. 217, 246 A. 2d 848 (1968) (eliminated vertical privity requirement); *Beckham v. Travelers Ins. Co.*, 424 Pa. 107, 225 A. 2d 532 (1967) (abandoned distinction between accidental means and accidental results); *Webb v. Zern*, 422 Pa. 424, 220 A. 2d 853 (1966) (adopted Restatement, Second, Torts §402A); *Campbell v. Fiorot*, 411 Pa. 157, 191 A. 2d 657 (1963) (repudiated prior rule regarding evidence of skidding car); *Catherwood Trust*, 405 Pa. 61, 173 A. 2d 86 (1961) (abolished Pennsylvania Rule of Apportionment); *Sinkler v. Kneale*, 401 Pa. 267, 164 A. 2d 93 (1960) (rejected prior case law which held infant does not have a cause of action for prenatal injuries); *Commonwealth v. Redline*, 391 Pa. 486, 137 A. 2d 472 (1958) (changed felony murder rule).

The controlling principle which emerges from these and other decisions is clear—the doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish.

## V.

Finally, it is suggested that if we abolish governmental immunity, our decision to do so should not ap-

ply to the instant case.[9] We refused to adopt that suggestion in *Falco v. Pados, supra,* as well as numerous other cases. See, e.g., *Commonwealth v. McCusker,* supra; *Commonwealth v. Archambault,* supra; *Conestoga National Bank v. Patterson,* supra; *Smalich v. Westfall,* supra; *Papieves v. Kelly,* supra; *Niederman v. Brodsky,* supra; *Reitmeyer v. Sprecher,* supra; *Kassab v. Central Soya,* supra; *Beckham v. Travelers Ins. Co.,* supra; *Webb v. Zern,* supra; *Flagiello v. Pennsylvania Hospital,* supra; *Griffith v. United Air Lines, Inc.,* supra; *Olin Mathieson C. Corp. v. White C. Stores,* supra. Cf. *Incollingo v. Ewing,* 444 Pa. 299, 282 A. 2d 206 (1971). On the basis of these decisions, appellee's argument that we do not apply our newly adopted rule to the facts of this case must be rejected.[10]

Having concluded that local governmental units—municipal corporations and quasi-corporations—are no longer immune from tort liability, the order sustaining appellee's preliminary objections is reversed and the record remanded for proceedings consistent with this opinion.

Mr. Justice MANDERINO joins in this opinion and files a concurring opinion.

Mr. Chief Justice JONES, Mr. Justice EAGEN and Mr. Justice O'BRIEN dissent.

---

[9] In *Great Northern Ry. Co. v. Sunburst Oil and Refining Co.,* 287 U.S. 358, 364, 53 S. Ct. 145, 148 (1932), the United States Supreme Court stated: "A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."

[10] Recently, the New Jersey Supreme Court noted, ". . . law is not likely to keep up with the needs of society if the litigant who successfully champions a cause is left with only that distinction." *Willis v. Department of Conservation and Econ. Dev.,* 55 N.J. 534, 541, 264 A. 2d 34, 38 (1970).

APPENDIX: Position of States with regard to Doctrine of Governmental Immunity.*

### JUDICIALLY ABROGATED

| | |
|---|---|
| Alaska | Louisiana |
| Arizona | Michigan |
| California | Minnesota |
| Colorado | Nebraska |
| Florida | Nevada |
| Idaho | New Jersey |
| Illinois | Rhode Island |
| Indiana | Wisconsin |
| Kentucky | District of Columbia |

### STATUTORILY ABROGATED

| | |
|---|---|
| Hawaii | Oregon |
| Iowa | Utah |
| New York | Washington |
| Oklahoma | |

### MODIFIED

| | |
|---|---|
| Connecticut | Texas |
| South Carolina | |

### INSURANCE-WAIVER THEORY

| | |
|---|---|
| Georgia | North Carolina |
| Kansas | North Dakota |
| Maine | Ohio |
| Mississippi | Tennessee |
| Missouri | Vermont |
| Montana | West Virginia |
| New Hampshire | Wyoming |
| New Mexico | |

---

* This compilation is based on material presented in Restatement, Second, Torts §895A at 12-20 (Tentative Draft, March 30, 1973).

COMMON LAW

| | |
|---|---|
| Alabama | Massachusetts |
| Arkansas** | Pennsylvania*** |
| Delaware | South Dakota |
| Maryland | Virginia |

CONCURRING OPINION BY MR. JUSTICE MANDERINO:

I join in the majority opinion by Mr. Justice ROBERTS. I should like to add that the doctrine of governmental immunity is unconstitutional as is the doctrine of sovereign immunity. No branch of government— the executive, the legislative, or the judicial branch— can deprive a citizen of proper redress for a wrong. The denial of justice in any case is not constitutionally permitted. See *Brown v. Commonwealth of Pennsylvania*, 453 Pa. 566, 580, 305 A. 2d 868, 875 (1973) (dissenting opinion by Mr. Justice MANDERINO).

** Judicially abolished but statutorily reinstated.
*** Until today Pennsylvania retained the common law immunity.