## Beisel v. Zerbe Township

*Frank E. Garrigan,* for plaintiff.
*Roger V. Wiest,* for defendant.

RANCK, *J.,* September 2, 1977—The question presented by this case necessitates an examination into a rather confused area of the law of torts. Plaintiff has brought this action in trespass on a theory of defamation alleging that in June of 1975, he was exposed to public ridicule at a duly con-

vened meeting of the supervisors of Zerbe Township in that he was falsely accused of a criminal act. Plaintiff charges that he was publicly fired by the township supervisors from his position as sewer plant operator and in explanation thereof, Albert Bridi, one of the above-mentioned supervisors, stated that plaintiff had removed from the township garage a wheel belonging to a police vehicle and placed the same on his own auto without permission. We note that plaintiff has brought this suit against the township rather than the supervisors.

In response to this action defendant has interposed preliminary objections in the nature of a demurrer pursuant to Pa.·R.C.P. 1017(b). Defendant argues that the supervisors are immune from suit both because they are high public officials and they sit as members of a legislative body. It is urged that this immunity coupled with the doctrine of respondeat superior insulates the township as a governmental entity from liability. Moreover, defendant asserts that because of the employer-employe relationship and various provisions of the so-called "Sunshine Act," it was bound to give a statement of reasons for the discharge, and if the statement was defamatory, plaintiff impliedly consented to the defamation by accepting the employ. Defendant's demurrer raising these issues is quite proper since they are apparent from the facts as stated in the complaint: Greenburg v. Aetna Insurance Co., 427 Pa. 511, 235 A.2d 576, 38 A.L.R. 3d 262 (1967), cert. den., sub. nom. Scarselletti, 392 U. S. 907, 88 S. Ct. 2063, 20 L. Ed. 2d 1366, reh. den. 393 U. S. 899, 89 S. Ct. 72, 21 L. Ed. 2d 187 (1968). We will analyze these issues in the inverse order.

The Township of Zerbe maintains that it has a complete defense to plaintiff's action in the form of consent. It is true that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." Restatement 2d Torts §583. The actions of plaintiff, however, must have instigated or invited the publication: Prosser, the Law of Torts §114 at 776, 784 (4th ed. 1971). The typical instance of consent in this area is the teacher dismissal cases. The usual pattern is for a teacher to be summarily discharged by a school board and subsequently demand that the reason for the dismissal be made public. Where the reason is published, the teacher is said to have consented to the publication even if it turns out to be defamatory: Restatement 2d Torts §583, Illustration 2; Procopio v. Shamokin Area School District, 48 Northumb. L. N. 249 (1976).

But the situation at bar is unlike the normal teacher dismissal case such as Procopio. Assuming as we must the truth of all relevant facts contained in the complaint and any inferences reasonably deducible therefrom: Reardon v. Wilbur, 441 Pa. 551, 554, 272 A.2d 888 (1971); there is no indication that plaintiff invited or instigated the publication by one of the supervisors. Specifically, there was no request for a public statement concerning the dismissal. Defendant, however, contends that the consent springs from a union between applicable provisions of the "Sunshine Act" and the very acceptance of public employ itself. Counsel for defendant is correct that the discharge of a township employe, effected by vote on a properly moved resolution, must, pursuant to the open meeting law or "Sunshine Act," take place in pub-

lic: Act of July 19, 1974, P. L. 486, secs. 1 and 2, 65 P.S. §§261, see definition of "formal action," and 262. But we reject the proposition that the burden placed on the supervisors to make the discharge public draws from plaintiff an implied consent to a public statement of the reasons therefor.

If it was necessary to discuss the information surrounding the dismissal, then these activities could have been carried on in executive session. See 65 P.S. §263. By assuming the responsibility of making a public statement explaining the discharge, without invitation to do so, the township shouldered the burden that the statement be accurate. Defendant would have us hold that implicit in the acceptance of public employment is the consent to be defamed. We realize that the nature of public service requires public scrutiny. We shudder to think, however, that every person who enters public service surrenders not only some degree of his privacy, but, should dismissal become his unhappy lot, the right to a good and honorable name as well. In our view, the General Assembly did not intend that the "Sunshine Act" should work an implied consent to defamation to the detriment of all public employes. Thus we overrule the second count of defendant's preliminary objections and turn to the issue of immunity.

The difficulty in resolving this issue arises from the tension between two conflicting doctrines of the law. In an attempt to protect the unfettered execution of governmental functions, the law grants an absolute privilege[1] to certain high public

---

1. One problem in this area is distinguishing between privileges and immunities. Although many courts use the terms interchangeably, Montgomery v. Philadelphia, 392 Pa.

officials to be free from the burden of defamation actions: Montgomery v. Philadelphia, 392 Pa. 178, 140 A.2d 100 (1958). Exercising the sole executive powers of the township and engaging in policymaking functions, township supervisors have been held to fall within the rubric of "high public officials." Jonnet v. Bodick, 431 Pa. 59, 244 A.2d 751 (1968). In this case the supervisors are doubly insulated since they are vested with the absolute privilege to publish defamatory matter that clothes all members of a local legislative body: Restatement 2d Torts §590; see Jonnet v. Bodick, 431 Pa. 59 at 62.

This rule of absolute privilege becomes relevant since a principal—the township—has a defense to the defamation action if its agent—the supervisors—has a privilege which can be exercised on the principal's behalf: Restatement 2d Agency §217 (a) (iii). Following this position, our Supreme Court in Montgomery v. Philadelphia, 392 Pa. 178 at 188, sustained a demurrer raised by the governmental entity stating: " . . . the individual defendants [herein] are absolutely privileged in making defamatory communications. . . . It follows that the city cannot be held liable therefor on the theory of respondeat superior."

---

178 at 182-3, the law of Agency makes a distinction: Privileges are delegable whereas immunities are not: Restatement 2d Agency § 217, Comment b. Prosser, following the language employed by the courts, also uses the terms interchangeably, but notes that "immunity" is "certainly the more accurate term" to denote the legal relationship that is created. Prosser, The Law of Torts § 114 at 776, n. 66. It is interesting to note that if Prosser and the Restatement 2d Agency are read together, then the township herein can have no protection, since an immunity, unlike a privilege, is not delegable. However, the court in Montgomery did not see fit to cut legal terminology quite so thin.

Conflicting with the above result is the desire to make governmental bodies less than the Commonwealth[2] responsible for torts committed in their name. In Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973), the Pennsylvania Supreme Court abolished the doctrine of governmental immunity thereby following a clearly established trend toward what is termed "collective responsibility." See Comment, Judicial Abrogation of Governmental and Sovereign Immunity: A National Trend with a Pennsylvania Perspective, 78 Dick. L. Rev. 365, 401 (1973). Attempting to reconcile these opposing policies, the Commonwealth Court has held that a governmental body should not be shielded by the privileges of its employes; for a strict application of agency principles would frustrate "the clear holding of Ayala, . . . at least to the extent that the servant or agent must be liable in tort to visit liability upon his employer or principal." Wicks et al. v. Milzoco Builders, Inc., et al., 25 Pa. Commonwealth Ct. 340, 347, 360 A.2d 250 (1976).

The question then becomes, does Ayala and Wicks, read together, overrule Montgomery to the extent that local governmental entities are no longer protected by the cloak of privilege provided by their agents? Although the court in Ayala abolished the doctrine of governmental immunity, it did so without directly commenting on freedom from suit resulting from application of respondeat superior concepts. We are in complete agreement with the Commonwealth Court, however, that any

---

2. The Pennsylvania Supreme Court upheld the sovereign immunity of the Commonwealth on the same day that Ayala was announced: Brown v. Commonwealth, 453 Pa. 566, 305 A.2d 868 (1973).

other treatment of this problem would work a circumvention of the Supreme Court's explicit intent in Ayala.[3] As counsel points out, then, the only difference between Wicks and the case at bar is that the former concerned negligence while we are involved here with defamation. Therefore, in judging the continued validity of that aspect of Montgomery which denied liability on the basis of respondeat superior, we must decide whether there are any critical policy differences between actions in negligence and defamation. Our research has failed to show any post-Ayala cases discussing this problem.

Counsel for defendant in a well drafted brief has advanced some strong policy arguments for denying relief in defamation actions against political subdivisions. It is urged that permitting recovery against the public entity would negate the absolute privilege afforded to high public officials; that while the agent might be spared personal liability, a suit against the political subdivision would still require the governmental officer to put "the good faith of his public actions before a jury." It is argued that this would have a "chilling effect" upon the performance of public duties and do injury to the free exchange of information.

We recognize that public servants must be free to pursue their duties without the threat of vexatious suits. Moreover, it goes without saying that the

_____
3. We are aware that the California courts have held that the government cannot be liable where the government's employe, in the exercise of his discretion, is not. But those cases involved interpretation of the California State Tort Claims Act, Ne/Cusek v. City of Los Angeles, 233 Cal. App. 2d 131, 43 Cal. Rptr. 294 (1965), and thus are not relevant to the present discussion. See Prosser, The Law of Torts §131 at 970, 986.

free transfer of information is vital to representative government. But we are not convinced that these important policies are sacrificed by permitting a remedy against the governmental body in whose name the defamation is perpetrated. While we do not question the immunity afforded to public officials from defamation suits, we note that there has been a considerable scholarly outcry against the rule denying any form of redress for the defamatory remarks of public servants. This rule has been described as "affording a golden opportunity for utterly unscrupulous politicians to abuse their position by inflicting outrageous injury upon the helpless and innocent, for the worst kind of motives. . ." Prosser, supra, at 784. See Gray, Private Wrongs of Public Servants, 47 Cal. L. Rev. 303 (1959), and Handler and Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv. L. Rev. 44 (1960), cited in Prosser, supra, at 784.

In our view, the court in Ayala has effected a compromise between the meritless harassment of public officers and a complete denial of remedy, by permitting an action against the governmental entity responsible for the publication. Such an approach retains the officer's absolute privilege and thus should not dampen the ardor with which his duties are performed, but at the same time requires some degree of accountability for the wrong. Chief Judge Learned Hand once remarked on the subject: "There must indeed be means of punishing public officers who have been truant in their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found

in a balance between the evils inevitable in either alternative." Gregoire v. Biddle et al., 177 F. 2d 579, 581 (2d Cir. 1949), cert. den. 339 U.S. 949 (1950). We believe that this approach strikes such a balance.

Hence, despite the policy arguments against governmental liability in defamation actions, we feel bound to permit this plaintiff his day in court. Certainly one of the prime goals of Anglo-American law can be crystalized in the phrase: "for every wrong there is a remedy." The law will not and should not stand idly by and permit the perpetration of torts without chance for grievance. If anything, this policy of the American common law is intensifying: Nolan v. Tifereth Israel Synagogue, 425 Pa. 106, 227 A.2d 675 (1967) (abolition of charitable immunity); Ayala v. Philadelphia Board of Public Education, supra.[4] We believe that both the temperament and intent of our highest appellate court is reflected in the following: "Recently, this court reiterated *the prevailing philosophy* that liability follows tortous conduct. In Niederman v. Brodsky, 436 Pa. 401, 403, 261 A.2d 84, 85 (1970), we said: " 'It is fundamental to our common law system that one may seek redress for every substantial wrong.' " (Emphasis supplied); Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 594. In our opinion, Ayala abolished all forms of governmental immunity and

---

4. We have little doubt that the Pennsylvania Supreme Court in Brown v. Commonwealth, supra, would have abolished sovereign immunity save for Article I, Section 11 of the Pennsylvania Constitution which the majority read as prohibiting their action. See Potter, Sovereign Immunity in Pennsylvania: An Open Letter to Mr. Justice Pomeroy, 38 U. Pitt. L. R. 185 (1976).

consequently that ruling "leaves local units of government open to liability for *all harm* they may cause through their operations" (Emphasis supplied), whether the trespass action is grounded in negligence or defamation. See Potter, Sovereign Immunity in Pennsylvania: An Open Letter to Mr. Justice Pomeroy, 38 U. Pitt. L. R. 185, 198 (1976). Hence, we must overrule the remaining count of defendant's preliminary objections and enter the following

## ORDER

And now, September 2, 1977, after due consideration of the written and oral arguments of counsel, we hereby dismiss defendant's preliminary objections in the nature of a demurrer and direct that a responsive pleading be filed within 20 days of the date of the filing of this order.